[L. A. No. 21675. In Bank. Nov. 27, 1951.]

FRANK GONSALVES, JR., et al., Respondents, v. FRANK W. HODGSON et al., Appellants.

92

Hansen & Sweeney, Victor R. Hansen and J. E. Simpson for Appellants.

Roland G. Swaffield for Respondents.

EDMONDS, J.—Frank Gonsalves, Jr., and six partners contracted with Hodgson-Greene-Haldeman Shipbuilders, a copartnership, to build a fishing vessel for them. Charging breach of the contract in many particulars, they sued the shipbuilders and a jury returned a verdict in their favor

upon each of three causes of action. The appeal is from the judgments entered upon these verdicts, from certain orders denying motions to vacate them, and from orders denying motions for the entry of judgments notwithstanding the verdicts.

F. W. Hodgson is one of the partners of Gonsalves and also a partner in Hodgson-Greene-Haldeman Shipbuilders. "By reason of his adverse interests in this litigation," the complaint states, he "has been joined as a party defendant."

The contract called for the construction of the "Liberty Bell," which was to be similar in size, shape and type to the "Viking," a tuna clipper which Hodgson had built without plans or specifications. However, the new ship was to be somewhat longer than the "Viking," and "complete in all respects, including the installation of propelling machinery."

The agreement of the parties required the best shipbuilding practices followed in the construction of tuna clippers. It also specified that: "All work shall be done in a proper and workmanlike manner, and shall pass the customary inclination test and customary approval by a competent marine insurance surveyor for insurance purposes."

The size, shape, and details of construction were to be under the direction and control of Hodgson. "If any dispute arises during construction concerning whether or not said 'LIBERTY' is similar to said 'VIKING,' said dispute shall be referred to P. Banning Young, and his decision thereon shall be final and binding upon all parties hereto."

By other provisions of the contract, the parties agreed that the shipbuilders were to construct the vessel for the cost of labor, overhead and materials plus 10 per cent. The amount to be paid was stated as follows: "It is estimated that the cost of the construction of said vessel 'LIBERTY' hereunder will be approximately One Hundred Ninety Thousand Dollars ($190,000.00). It is expressly understood, however, that the Builder does not guarantee the correctness of this estimate and if said cost exceeds or is less than said sum of One Hundred Ninety Thousand Dollars ($190,000.00) Buyers shall nevertheless be bound and obligated to pay to Builder the cost of said construction as herein set forth and all other money agreed to be paid to Builder as herein set forth."

Provision was then made for the method of payment, material purchasing procedure, and insurance. The contract required an inclination experiment followed by a trial run before delivery of the vessel to the buyers. After the inclina-

tion test and trial run, the buyers could demand such changes in the vessel as might be necessary.

Delivery to the buyers was to be made at the builders' shipyard. It was agreed that acceptance of the vessel should relieve the builders of all liability except for the replacement of parts fabricated by them, provided the vessel was brought to the builders' shipyard for that purpose. The builders expressly were absolved of liability for defects in machinery, equipment or fittings manufactured and supplied by others.

The buyers were given the right of inspection by a person of their choosing. The contract then provided that the builders should be notified in writing in regard to any disputes concerning construction, the nature and character of the complaint to be stated in detail. If the parties could not settle the dispute between themselves, it was to be referred to arbitration. In the absence of any complaint in writing, "it shall be conclusively presumed that said vessel is being constructed in a manner satisfactory to Buyers and Buyers shall be precluded from thereafter raising any objections thereto."

The complaint charges that the shipbuilders breached this contract in a number of particulars. The first cause of action alleges in part: "In the building and construction of said vessel, the defendants failed and refused to follow and use the best shipbuilding practices commonly used and followed in the construction of tuna clippers and failed to do said construction work in a proper or workmanlike manner, and in said respects and particulars intentionally and purposely violated and failed to perform and carry out their fiduciary duties to the plaintiffs. . . ." As stated by the pleader, "Plaintiffs believed and relied upon said representations and then and there agreed to entrust to said defendants all matters pertaining to the direction and control of the size, shape and details of construction of said vessel, and especially those matters pertaining to the use and adoption of the best shipbuilding practices in said construction work and the performance of all such work in a proper and workmanlike manner." Taken in its entirety, this cause of action appears to be for breach of a contract based upon a fiduciary relationship. The damages claimed are for asserted structural defects and the inflated costs of labor and materials.

The second cause of action declares that the contract was entered into because of the fraud of the shipbuilders. More specifically, it is said, the shipbuilders knowingly made false

and fraudulent representations that they had carefully estimated and computed the cost of the vessel, whereas, in fact, they had not done so. The buyers further assert that the shipbuilders actually believed that the vessel would cost not less than $250,000, rather than $190,000.

The third count of the complaint, which incorporates portions of the first cause of action, also claims damages arising out of alleged breaches of fiduciary duty imposed by the contract. These damages have been sustained, it is said, because of the loss of profits to the crew member buyers of the vessel during the period it was laid up for repairs.

By answer, the shipbuilders admit the execution of the written agreement. They allege that it contains the complete agreement between the parties, except as to amendments which are not here material. They deny the making of any representations other than those contained in the written agreement, and specifically allege that they did not assume any trust relationship.

The shipbuilders admit construction and delivery of the vessel. They allege that at the time of delivery the buyers executed a receipt and full release of the shipbuilders. They deny all allegations of fraud to induce the contract and specifically plead its provision stating the sum of $190,000 as an estimate not guaranteed to be correct. The answer also asserts that, during construction, the buyers knew the cost was exceeding the estimate and subsequently ordered the construction to proceed.

As affirmative defenses, the shipbuilders allege that the buyers at all times had their representative in attendance during construction. He inspected the construction, they plead, and when the vessel was delivered to the buyers, they executed an agreement to the effect that it had been constructed as authorized. They also rely upon the contractual provisions requiring all disputes regarding similarity of the "Liberty" to the "Viking" to be submitted to arbitration. No arbitration was requested by the buyers, they say, nor were any disputes reduced to writing. They refer to the contractual provisions that, in the absence of a complaint in writing, satisfactory construction shall be conclusively presumed, and the buyers precluded from raising any objections thereafter. A further defense is that the shipbuilders' liability is restricted to replacement of defective parts, upon return of the vessel to the shipbuilders.

Evidence presented upon the trial tends to prove the following facts:

Gonsalves and two of his partners, Strumm and Kettler, closely followed the construction of the vessel and made periodic inspections of the materials and workmanship being put into it. Among other complaints made by them, they said that Hodgson was not giving proper attention to the job and the labor costs were excessive. They also declared that lumber was not properly charged to the vessel and some of it disappeared before being used. Other discrepancies in the methods of construction were called to the shipbuilders' attention, but none of the complaints was reduced to writing. At the insistence of Gonsalves, certain structural changes were made and, at one time, Gonsalves chose a hull superintendent to replace the one employed by the shipbuilders.

Weekly labor invoices and monthly material invoices were rendered by the shipbuilders during construction. These were referred to the timekeeper and material checker selected by Gonsalves and his associates in accordance with the contract. If found to be correct, the bills were paid; if not, any controversy concerning them was settled.

A trial run of the ''Liberty Bell'' was made pursuant to the contract, with Gonsalves, Kettler and Strumm on board. The vessel passed the customary inclination test called for in the contract and was approved for insurance purposes by a competent marine insurance surveyor.

After the trial run and while construction work remained to be done on the ''Liberty Bell,'' Gonsalves insisted upon taking it from the shipyard. Delivery of the ship was made under protest and only upon the condition that the buyers accept the vessel as completed. In accordance with this requirement, the owner signed a receipt which states in part: ''The construction authorized by Contract . . . has been complied with, and the vessel at the time of delivery was complete and shipshape. . . . All machinery and operating components were in good working order and the vessel was entirely seaworthy.''

Gonsalves then sailed the vessel under its own power from Long Beach to San Diego, where another shipyard performed further work upon it. Less than 30 days from the date of delivery, the ship made her maiden voyage. On this trip, certain defects in construction were discovered.

About three months later, the vessel returned to port and the shipbuilders were notified of these defects. They re-

quested that the vessel be returned to their shipyard for inspection as required by the contract. This demand was refused, and Gonsalves obtained repairs at a San Diego drydock.

The jury found for the plaintiffs on each count. The appeal is from each of the judgments, an order denying the defendants' motion to vacate, amend or correct the judgment on the third cause of action, an order denying the motion of M. R. Mackaig to have judgment entered in his favor individually upon the first and second causes of action, an order denying the motion of F. W. Hodgson to have judgment entered in his favor individually and as a party in interest with the plaintiffs, and orders denying the motions of the defendants and of F. W. Hodgson, individually and as a party in interest with the plaintiffs, for judgments notwithstanding the verdicts.

As grounds for reversal of the judgment and of the several orders adverse to them individually and collectively, the shipbuilders assert, among other points presented, that (1) there was no fiduciary relationship; (2) the buyers failed to perform conditions precedent to liability under the contract; and (3) the contract was not induced by fraudulent representations and, even if it was, the record shows no proof of resulting damages.

In support of the jury's verdict and the rulings of the trial court, Gonsalves and his associates take the position that (1) a trust or fiduciary relationship existed between the parties; (2) They were not required to return the vessel for correction of defects; (3) None of the controversies involved was within the scope of the arbitration clauses and, if it were, the shipbuilders had waived their right to arbitration; (4) The shipbuilders' liability was not limited to replacing defective parts; (5) They are not bound by the delivery receipt because it was obtained by undue pressure and influence; (6) There was no accord and satisfaction; (7) They were induced to enter the contract by fraudulent representations and the evidence is sufficient to sustain the jury's finding of damages caused thereby; (8) The evidence is sufficient to justify the jury's finding of damages for loss of profits; (9) The verdicts are within the pleadings, evidence and instructions; and (10) There is no misjoinder of parties or causes.

The conclusion is inescapable that no trust relationship was created by the contract, or by the dealings of the

parties under it. Section 2216 of the Civil Code provides: "A voluntary trust is an obligation arising out of a personal confidence reposed in, and voluntarily accepted by, one for the benefit of another." The following section reads: "An involuntary trust is one which is created by operation of law."

The distinction between a trust and a contract is stated in 1 Bogert, Trusts and Trustees, section 17, as follows: "Strange as it may seem, there is occasional confusion with regard to the legal incidents of contract and trust. . . .

"One of the major distinctions between trust and contract is that in the former there is always a divided ownership of property, the trustee having usually a legal title and the cestui an equitable to the same res; whereas in contract this element of division of property interest is entirely lacking."

The Restatement of Trusts, section 74, provides: "A trust cannot be created unless there is trust property." The same requirement is made by section 2221 of the Civil Code, which declares that there must be trust property. The statute specifies that ". . . a voluntary trust is created, . . . by any words or acts of the trustor, indicating with reasonable certainty: . . . 2. The subject, . . . of the trust."

Trust property is defined by the Restatement of Trusts, section 2, comment c, as follows: "The term 'trust property' denotes the interests which are held in trust." Section 74, comment b, of the Restatement further defines trust property in the following manner: "Property includes such interests as may be the subject of a present transfer by way of outright gift, outright devise or bequest, or sale. Such interests can be held in trust. . . .

"The knowledge or skill which a man possesses is not property. It is true that he can make an agreement to communicate his knowledge and to exercise his skill, but such an agreement is not a transfer of property and is binding only if the requirements for the formation of a contract are complied with."

Here there was no divided ownership of property. The contract called for construction of a ship, to be paid for in installments as construction progressed. Certainly the vessel was not held in trust by the builders for the buyers.

The contention of Gonsalves and his associates seems to be that a fiduciary relationship arose out of the promise to construct the vessel in a "workmanlike" manner, in dependence upon the special knowledge and skill of Hodgson. But his knowledge or skill was not property which might be

held in trust. It could be the subject only of a contractual obligation.

Nor was there here any fiduciary relationship between the parties. As is said in 1 Bogert, Trusts and Trustees, section 17, ". . . there is no fiduciary relation in the case of debt or other contract duty. The rights and duties of parties to a contract may generally be freely transferred. The trustee cannot assign his trusteeship or delegate the performance of his duties. . . . There is no rule that parties to a contract may not act for their own interest during the execution of the contract. They have no duty of loyal representation of the opposing party in the relationship."

The parties here were engaged in a course of arms-length dealing. Hodgson was to use his knowledge and skill in the supervision of the construction. Gonsalves and his associates were given, and exercised, a supervisory check on all phases of construction. They retained rights of control which completely negative any implication of a fiduciary relationship.

There being no trust or fiduciary relationship, the only breach which could have occurred would have been one of a strictly contractual obligation. Even if the shipbuilders breached their contract, as the jury impliedly found, the buyers are not entitled to recover therefor unless they have fulfilled their obligations.

Section 1439 of the Civil Code provides in part: "Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; . . ." A condition precedent is defined by section 1436 as "one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."

Under the contract, the liability of the shipbuilders was limited to the replacement of parts. However, a condition precedent to such liability was that the vessel be returned to the shipbuilders for such replacement. Gonsalves and his associates refused to comply with that requirement.

The factual situation in *Union Investment Co.* v. *F. M. Landon Co.*, 32 Cal.App. 305 [162 P. 903], involved a condition similar to the one here. In that case, a stallion was sold under a contract providing that if he did not measure up to specified standards, he would be replaced by another one upon his return to the vendor. The stallion was not returned.

In a suit by the vendor upon a promissory note given as part of the purchase price, the answer alleged failure of con-

sideration in that the stallion did not measure up to specifications. A judgment for the vendee was reversed because, as stated by the court, "it is plainly manifest that the defendants not only wholly failed to discharge the obligation or condition to which they subscribed and bound themselves, but that they purposely refused to perform the condition. . . . A failure on the part of the vendees to return the property as agreed would constitute the breach of the agreement by them, and so absolve the vendors from the obligation of replacing the same with other property of like kind and value." (P. 312.)

So in the present action, Gonsalves and his associates committed themselves to an exclusive remedy in the event of structural failure. They were to return the vessel to the shipbuilders for replacement of parts which proved faulty within 30 days after delivery. This they refused to do. Failure to perform the condition precedent relieved the shipbuilders of liability under the express terms of the contract. For this reason alone, the judgments on the first and third causes of action must be reversed.

The buyers' second cause of action is for damages for fraudulent representation inducing the contract. By its terms, the cost of construction was "estimated" at "approximately" $190,000. The contract expressly provided that the shipbuilders did not "guarantee the correctness of this estimate" and Gonsalves and his associates obligated themselves to pay the cost whether it exceeded or was less than the estimate, together with "all other money agreed to be paid to Builder."

The respondents argue that the fraudulent representation was not the estimate of $190,000, which they label in their complaint as an "opinion," but a statement that the cost had been carefully estimated and computed. In fact, they do not attempt to rely on that amount but base their claim for damages on testimony that the estimated cost was about $1,000 per ton. There is a serious question as to whether such evidence was properly admitted, but in view of the conclusions which have been stated, that point need not be decided.

In an action for damages for deceit, the fraudulent representation relied upon must be as to a material fact which is false and known to be false by the maker, or is recklessly made or made without reasonable grounds for believing its truth. It must be made with intent to induce action by the other party and it must have been relied upon by the other party with justification. It must result in damage or injury

to the party so relying. The absence of any one of these elements will preclude recovery. (*Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561 [126 P. 351, 42 L.R.A.N.S. 125]; Civ. Code, § 1709; 12 Cal.Jur. 724; Restatement of Torts, § 525.)

 The record fails to show any damage resulting from the alleged fraudulent representation. Gonsalves and his associates contracted for, and received, a fishing vessel. The record fails to disclose its value, other than the cost of the vessel. That the total cost was somewhat more than the buyers expected to pay does not constitute a showing of injury or damage.

Section 3343 of the Civil Code provides in part: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction."

Conceivably, in a situation such as that shown by the present record, the value of the vessel might be less than its cost. For example, if because of the exigencies of the fishing business the cost of the vessel, properly constructed, was exorbitant in relation to its possible earnings, it might not be worth the price paid. But to make such a showing, under the terms of the contract, the buyers would have had to return the vessel to the shipbuilders for rectification of any structural defects. They cannot claim as damages or as evidence of decreased value, amounts spent upon repairs which the shipbuilders were obligated to make without charge under the contract. Nor can they recover the amount in excess of that which they expected to pay. They must show that the actual value of the ship properly constructed was less than the amount which they paid. This they have failed to do, and for that reason the judgment on the second cause of action must be reversed.

The foregoing conclusions make it unnecessary to discuss the remaining contentions of the parties. Each of the judgments is reversed. All other appeals are dismissed.

Gibson, C. J., Carter, J., Traynor, J., and Spence, J., concurred.

Schauer, J., concurred in the judgment.

Respondents' petition for a rehearing was denied December 20, 1951.