[Civ. No. 17740.   First Dist., Div. One.   Oct. 29, 1958.]

FRED S. CLAR et al., Plaintiffs and Appellants, v. BOARD OF TRADE OF SAN FRANCISCO (a Voluntary Association) et al., Defendants and Appellants.

Lawrence Livingston, Leo E. Borregard and Livingston & Feldman for Plaintiffs and Appellants.

James M. Conners and Vernon D. Stokes for Defendants and Appellants.

PETERS, P. J.—In a complaint charging, in the first count, intentional fraudulent misrepresentation in the sale of the assets of a plumbing house, and in the second negligent misrepresentations made to induce such sale, Fred and Harvey Clar brought this action against the Board of Trade of San Francisco and W. J. Hempy, individually, as trustee, and as assignee for the benefit of the creditors of Smith Pipe and Supply Company. The trial court dismissed the first count, but found for the plaintiffs on the second count, fixing damages at $2,823.74. From the judgment entered in this amount both sides appeal.

At all times here relevant the two plaintiffs were engaged in the business of purchasing the assets of insolvent businesses and reselling them. Harvey Clar had had at least four years' experience in this field, while Fred Clar had been in the business for but five months prior to the transaction here involved. During this five-month period the Clars had purchased four stocks of merchandise from the Board of Trade. On these occasions they found the board's cost and price figures, and its methods of pricing merchandise, to be fair and accurate.

In July of 1954, the board, through its secretary Hempy,

was the assignee and trustee for the creditors of Smith Pipe and Supply Company, a jobber of plumbing supplies. The board, in this capacity, caused an inventory of the fixtures and stock in trade of the Smith Pipe and Supply Company to be prepared, and, based on this inventory, offered these assets for sale under sealed bids. The invitation to bid requested prospective bidders to see the inventory and to inspect the property on July 20th or July 21st, 1954. Bids had to be submitted by 2 p.m. on July 22, 1954.

The two plaintiffs on July 21st visited the Smith premises where the property was located. They were given a copy of the inventory by Greyson, an employee of the Board of Trade. This inventory had been prepared by Greyson and his assistant, a Mr. Johnson. The plaintiffs spent about two hours looking over the property. The inventory represented that the "wholesale value" of the merchandise to be sold was $53,-181.62. "Wholesale value" is synonymous with "wholesale price." The inventory represented that the "average manufacturer's cost" was $37,227.14. To this figure was added supplies and miscellaneous articles valued at $1,885.09, making a total of $39,112.23. The "average manufacturer's cost" was arrived at by taking 30 per cent off of the "wholesale value." The manufacturer's cost is the price paid by the wholesaler to the manufacturer.

When the plaintiffs arrived to inspect the property they inquired about the basis used to determine "manufacturer's cost." Greyson replied that he had taken the "wholesale price" and deducted 30 per cent to establish the estimated cost of the property to Smith. Greyson also stated that the inventory figures had been arrived at by using the figures contained in the Current Price Book, a standard book for pricing plumbing materials, and from the figures found in Smith's inventories and in Smith's invoices. There was no copy of the Current Price Book at the Smith premises, and plaintiffs did not have a copy.

Plaintiffs looked over the stock and determined that it was a well-rounded stock of new merchandise in excellent condition. They checked the inventory price of certain brass items with which they were familiar and spot-checked a few of these items. They found them to be correct. The plaintiffs determined that, if they were successful bidders, they would resell the property at a flat sale, that is, at a sale where the items would be individually resold, and not try to resell the stock in bulk.

The plaintiffs then computed their bid. They relied upon the inventory figures showing the average manufacturer's cost, and bid approximately 60 per cent of that cost as represented. They expected that if they could secure the property at that figure, they could resell at a profit. Their written bid was $22,696.99. This was the highest bid submitted and was accepted by the defendants. Thereafter, the property was checked against the inventory as to quantity, and delivered to plaintiffs.

Plaintiffs arranged to rent the Smith premises so that the property could be sold there. They then sent advertisements to prospective customers informing them that starting on August 5, 1954, the property would be sold at prices ranging from 30 per cent to 60 per cent less than wholesale. Prospective customers arrived at the premises as early as August 2nd, and plaintiffs began selling items. In determining the wholesale price from which to compute the advertised discounts plaintiffs used the figures as set forth in the Board of Trade inventory. During the course of these early sales plaintiffs were informed by their customers that the wholesale prices upon which the deductions were being computed were incorrect and were too high. On August 4th plaintiffs secured a copy of the Current Price Book and checked several items against the board's inventory. They found several errors and then proceeded to make a more complete check. They found that many items were inventoried higher than the price book. They discovered that as to many items the wholesale price listed on the inventory was actually the manufacturer's list price.

Upon discovering these errors the plaintiffs complained to the Board of Trade. They first talked with a Mr. Ryan who was in charge of administering the Smith assignment and who had caused the inventory and notice of sale to be prepared. Ryan, on behalf of defendants, had received the bids and had notified the plaintiffs that they were the high bidders.

On August 10th a meeting was held which was attended by Greyson and Ryan and by the two plaintiffs. Plaintiffs testified that they showed Greyson and Ryan some of the mistakes, and pointed out how they thought they had occurred, and that then "Greyson looked at the inventory that the Board of Trade had originally made up and looked at the corrections that Fred showed him, and said to this extent, that he just couldn't understand how the mistake was made, either Mr. Johnson, who was helping him at that time, might have made

the mistake, or he was aside himself to explain how the mistake was made.'' It was agreed that Greyson would go to Smith Pipe and Supply Company and retake the inventory so that a corrected wholesale price could be obtained. When plaintiffs asked Ryan if they should continue their sale ''we were told that for the best of everyone concerned that we should go on with the sale and corrections would be made.''

Plaintiffs then had the inventory checked against the prices in the Current Price Book. This check revealed that the wholesale prices of the merchandise aggregated $38,987.65, as compared with the sum of $53,181.62 as set forth in the Board of Trade inventory. Thus, there was a difference of $14,193.97.

Greyson testified that the inventory he had prepared tried to arrive at the wholesale prices of the stock as near as possible by using the figures in the Current Price Book, and by using Smith's inventory and invoices where available. That was how the $53,181.62 figure was computed. Then the cost to Smith was estimated, that is, the manufacturer's cost was estimated, by deducting 30 per cent from the estimated wholesale figure. These figures were contained in the inventory submitted to plaintiffs. Thus, the inventory represented that the wholesale value or price of the goods was $53,181.62, and that the ''average manufacturer's cost'' was $37,227.14, plus $1,885.09, the estimated cost of certain miscellaneous articles.

After the conversation at the Board of Trade the plaintiffs continued with their sale, which lasted for about five weeks, six days a week. The amount received from the sale was $19,407.37. There were unsold items of a stipulated value of $465.88. Thus, the amount received at the sale and the value of the unsold items totaled $19,873.25 or $2,823.74 less than plaintiffs had paid the Board of Trade for the merchandise. At this sale plaintiffs sold the items at between 30 per cent to 60 per cent less than wholesale, as advertised, averaging about 50 per cent of the wholesale price as set forth in the Current Price Book. They had expected to make a 15 per cent to 20 per cent profit on the resale. At this sale the plaintiffs incurred certain expenses for rent, salaries, advertising and utilities, totaling $1,130.45.

As already pointed out, plaintiffs' complaint was in two counts. The first charged intentional fraud, and the second negligent misrepresentation. The trial judge dismissed the first count on intentional misrepresentation and directed that a finding be prepared on this issue, which was done. Then,

on the negligent misrepresentation count, the court found in favor of the plaintiffs, and fixed plaintiffs' damages at $2,823.74, the difference between the amount plaintiffs paid for the stock and the gross amount received on the resale. The court specifically refused to make any allowance to plaintiffs for the $1,130.45 expenses incurred on the resale.

The defendants appeal from the judgment, and the plaintiffs appeal from that portion of the judgment awarding them $2,823.74, claiming they are entitled to $3,954.19.

The complaint as to the second cause of action alleges, among other things, that defendants invited plaintiffs and others to bid on the merchandise involved and in connection therewith delivered to prospective bidders, including plaintiffs, a written inventory of the merchandise to be sold; that the inventory stated and represented that the average manufacturer's cost of the merchandise was $37,227.14, and that the total inventory was of the value of $39,112.23; that these statements were untrue; that defendants had no reasonable grounds for believing that these representations were true and such representations were negligently made; that the statements were made with the intent to induce plaintiffs to bid on the merchandise and with knowledge that the offer by plaintiffs would be made in reliance thereon; that the true average manufacturer's cost, computed by deducting 30 per cent from the wholesale price, was $29,176.45; that plaintiffs believed the representations to be true and relied upon them and would not have entered into the transaction were it not for such belief and reliance; that plaintiffs, based on such reliance, offered to buy the merchandise and equipment for $22,696.99; that this was the highest offer made and was accepted by defendants, and said sum was paid to defendants by plaintiffs; that plaintiffs resold the merchandise in the general course of their business (plus the value of unsold items) for $19,873.25. Plaintiffs prayed for a judgment for an amount almost double the amount of the award.

The evidence has already been generally summarized. The findings are generally responsive to the issues presented by the complaint, but are much more detailed, and, in some respects, more comprehensive.

The court first found that plaintiffs were in the business of buying and reselling liquidated stocks of merchandise, and defendants knew that this was so. The court then found the facts in reference to the invitation to bid made by defendants, and the delivery to plaintiffs of the inventory of the stock to

be sold substantially as such facts are alleged in the complaint. It is then found that in this inventory defendants represented that the "wholesale value" of the merchandise was $53,181.62; that by deducting 30 per cent therefrom the "average manufacturer's cost" was represented to be $37,227.14, and that such amount was also represented to be the "total inventory value" of the goods to be sold, plus an additional $1,885.09 as the value of certain furniture and supplies, making a total of $39,112.23; that defendants at the time of delivery of the inventory to plaintiffs also represented that the "wholesale value" of the goods had been computed from the Current Price Book, a generally accepted trade cost book, and by the inventories of the Smith Pipe and Supply Company and from some invoices of that company; that these statements, except those specifically found to be true, were false and untrue, and were asserted positively by defendants in a manner not warranted by the information defendants then had; that defendants did not have reasonable grounds for believing such false statements were true; that such false statements were negligently made with intent to induce plaintiffs, and others, to bid on such property; that defendants knew that any bid by plaintiffs would be based on such statements. It is specifically found to be untrue that plaintiffs were long experienced in the business of buying and selling distressed stocks, or that plaintiffs possessed information with respect to the value of the stock of merchandise equal or superior to that of defendants. It is found that plaintiffs viewed the property prior to making their bid, but such inspection was a limited one; that defendants did not furnish to plaintiffs, prior to the latter's bid, the source of the information upon which the inventory was based, and plaintiffs did not possess equal knowledge with defendants as to the value of the property. It is found that plaintiffs believed the representations of value to be true and relied upon them; that the representations as to the wholesale value and the average manufacturer's cost were false and untrue in that the wholesale value of the goods as determined by the Current Price Book was $38,987.65 and the average manufacturer's cost, determined by deducting 30 per cent from the wholesale value, was $27,291.36, and that when the cost of furniture and supplies were added, the total real average manufacturer's cost was $29,176.45. The court specifically found that the false statements above referred to were statements and representations of fact and not

of opinion; that plaintiffs believed and relied upon such statements; that the statements were material and plaintiff's reliance thereon was justified; that in reliance on such statements plaintiffs bid, and subsequently purchased, the property from defendants for a total sum of $22,696.99, and paid such sum to defendants; that prior to making their bid plaintiffs looked at the property but inspected and examined only certain of the items made of brass, and that as to the inspection of the other articles it was a general inspection to determine quantity and condition and not to determine value; that the plaintiffs resold the property at a liquidation sale, as defendants knew that they intended to do, so that the purchase from defendants and resale by plaintiffs was made in the same type of depressed market; that plaintiffs resold the items purchased at prices which were 30 per cent to 60 per cent below wholesale prices; plaintiffs resold most of the items for $19,407.37; that such sale was fairly made, and $19,407.37 was the gross value of the merchandise sold without any allowance for the cost of selling; that certain items unsold were of the stipulated value of $465.88, so that the gross value of what plaintiffs received was $19,873.25; that the difference between the amount which plaintiffs paid to defendants and the gross value of what they received is $2,823.74. The court then found that plaintiffs expended $1,130.45 in making the resale; that such expenditures were necessarily incurred in order to make the sale and were reasonable in amount, but such expenditures were not proximately caused by the fraud of defendant and are not additional damages arising out of the transaction here involved. It is then found and concluded that plaintiffs have been damaged in the sum of $2,823.74.

Fraud in this state includes not only intentional misrepresentation, but may also consist of a negligent misrepresentation. Section 1572 of the Civil Code includes in its definitions of "actual fraud" the "positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true." Section 1710, subdivision 2, of the same code defines "deceit" as "The assertion, as a fact, of that which is not true, by one who has no reasonable grounds for believing it to be true." Under these sections intent to deceive is not necessarily a part of the cause of action, and a negligent misrepresentation made with intent to induce the other party to enter into the contract, if the other elements of fraud exist, is actionable. (*Gagne* v. *Bertran,* 43 Cal.2d 481 [275 P.2d

15]; *Gonsalves* v. *Hodgson*, 38 Cal.2d 91 [237 P.2d 656]; *Spreckels* v. *Gorrill*, 152 Cal. 383 [92 P. 1011]; *McMahon* v. *Grimes*, 206 Cal. 526 [275 P. 440]; *Richard* v. *Baker*, 141 Cal. App.2d 857 [297 P.2d 674].)

The basic elements of a fraud action of this type that must be pleaded and proved, are well settled. The plaintiff must plead and prove that defendant made a representation of a material fact; that such fact was false; that defendant knew it to be false or negligently or recklessly made the assertion as a fact without reasonable grounds to believe it to be true; that such representation was made with intent to induce the other party to act upon it; that it was relied upon by the other party to his damage. (*Cox* v. *Westling*, 96 Cal.App.2d 225 [215 P.2d 52].)

Representations of opinion are not generally actionable. Generally, the representation must be of a material fact. Representations of value are usually considered matters of opinion, but may be a representation of fact. If value is represented as a fact and not given as a mere opinion, it may be actionable. (*Stumpf* v. *Lawrence*, 4 Cal.App.2d 373 [40 P.2d 920].) Whether a particular representation of value is one of fact or opinion is a question of fact. (*French* v. *Freeman*, 191 Cal. 579 [217 P. 515].)

In the United States there are, in general, two different measures of damages for actionable fraud whether intentional or negligent. One, adopted in the majority of states, is the so-called "benefit of the bargain" rule, the other, the "out of pocket rule." For many years the California courts applied the "benefit of the bargain" rule. (See *Evans* v. *Gibson*, 220 Cal. 476 [31 P.2d 389]; *George Cople Co.* v. *Hindes*, 34 Cal.App. 576 [170 P. 155].) But in 1935 the Legislature enacted section 3343 of the Civil Code. It provides:

"One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.

"Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

With the enactment of this code section California joined the minority of jurisdictions limiting damages in such cases to the amount the plaintiff is "out of pocket." (See

Prosser on Torts (2d ed.) 568, note 82.) ■ The Supreme Court has held that the code provision provides the exclusive measure of recovery, and is not merely alternative. (*Bagdasarian* v. *Gragnon*, 31 Cal.2d 744 [192 P.2d 935] ; see also *Feckenscher* v. *Gamble*, 12 Cal.2d 482 [85 P.2d 885] ; *Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290 [149 P.2d 177] ; *Herzog* v. *Capital Co.*, 27 Cal.2d 349 [164 P.2d 8] ; *Gonsalves* v. *Hodgson*, 38 Cal.2d 91 [237 P.2d 656] ; *Hartwigsen* v. *Ditto*, 156 Cal.App.2d 811 [320 P.2d 114].) ■ Of course, this rule limiting damages to the difference between the actual value and the amount paid does not prevent an additional award, in a proper case, for punitive damages (*Bagdasarian* v. *Gragnon*, 31 Cal.2d 744 [192 P.2d 935] ; *Lawson* v. *Town & Country Shops, Inc.*, 159 Cal.App.2d 196 [323 P.2d 843]), nor would it prohibit, in a proper case, an award for breach of warranty. (*Bagdasarian* v. *Gragnon*, 31 Cal.2d 744 [192 P.2d 935] ; Prosser on Torts (2d ed.) 569.)

There is no serious dispute about these principles of law. We turn now to the specific contentions of appellants.

■ One of their basic contentions is that the complaint alleges that the total inventory was represented to be of the value of $39,000 plus ; that the true value of the inventory was $29,000 plus, for which the plaintiffs paid $22,000 plus. It is therefore urged that, under the "out of pocket" rule, since plaintiffs received property of the pleaded value of $29,000 plus for which they paid but $22,000 plus, they were not damaged under the "out of pocket" rule. The complaint is somewhat ambiguous in this respect. It makes the allegations upon which appellants rely, but also alleges that the property was resold in the general course of business for $19,000 plus. In the absence of a special demurrer, and none appears in the record, that may be tantamount to an allegation that the property was worth but $19,000, less the expenses of sale. But even if it be assumed that the complaint was subject to a special demurrer, or even a general demurrer, because legal damage was not properly pleaded, no such demurrer appears in the record. The defect, if it be a defect, was supplied by the evidence. That such a defect, even the failure to plead an essential element of the cause of action, may be cured by evidence at the trial is well settled. (*Slaughter* v. *Goldberg, Bowen & Co.*, 26 Cal.App. 318 [147 P. 90] ; *Priebe* v. *Sinclair*, 90 Cal.App.2d 79 [202 P.2d 577] ; *Randolph* v. *Hunt*, 41 Cal. App. 739 [183 P. 358] ; *Noakes* v. *City of Los Angeles*, 179 Cal. 38 [175 P. 409] ; *Bridges* v. *Price*, 95 Cal.App. 394 [273

P. 72] ; *Hedlund* v. *Sutter Med. Serv. Co.,* 51 Cal.App.2d 327 [124 P.2d 878].)

The evidence shows that the defendants represented that the ''wholesale value'' of the goods was $53,000 plus, and that the average manufacturer's cost was $39,000 plus. The evidence shows that the manufacturer's cost, computed by deducting 30 per cent from wholesale, a formula used by defendants, was $29,000 plus. The plaintiffs bid $22,000 plus for the property and in the normal course of business resold the property for $19,000 plus, less costs of the resale. The only real question involved on this appeal is whether plaintiffs have shown damage. Admittedly, they received property of the wholesale value of $29,000 plus for which they paid $22,000 plus. At first blush it would appear, therefore, that they could not have been damaged under the ''out of pocket'' rule. This is the basic argument of defendants. But this argument overlooks the realities of the situation, and the evidence. Defendants were selling in a depressed market. They were selling as trustees for the benefit of creditors. Obviously, the wholesale price or value of the goods was not the then true value of the goods. No one would pay the defendants the wholesale price because at that price they could buy the goods from a wholesaler and secure the normal benefits of such a sale. Defendants, of course, knew that they were selling in a depressed market. They also knew that plaintiffs were liquidators and intended to resell in this same depressed market. The only evidence of value is that the manufacturer's price was $29,000 plus, and that the goods were resold for $19,000 plus. The question presented is whether the evidence supports a finding that as of the date of sale to plaintiffs the value of the goods was $19,000 plus. The answer is obvious. The resale by plaintiffs occurred within a short time of the date of purchase. For the purpose of computing damages under section 3343 of the Civil Code, the price received on the resale was evidence sufficient to support the finding of the actual value of the property on the date of sale to plaintiffs. It has been held that evidence of the price paid the defrauded party at a subsequent sale is admissible and will support a finding of the actual value of the property as of the time the fraud was perpetrated. In *Bagdasarian* v. *Gragnon,* 31 Cal. 2d 744, 755 [192 P.2d 935], the court stated :

''The next question, therefore, is whether the trial court acted properly in accepting as evidence of *market* value the *actual* price per ton obtained upon sales made by respondents

from the *identical* crops involved in this litigation. Market value of personal property may, of course, be established by testimony of expert witnesses, but this is not the only method, and it has been generally held that the reasonable value of marketable personal property may be shown by market prices or actual specific sales of *other similar* property, provided such sales are bona fide and not too remote in time or place. [Citations.]

"Similarly it has been held that market value of personal property may be shown by the price paid for that identical property or by the price obtained for it at a subsequent sale. [Citations.] . . .

". . . As stated in McCormick on Damages [1935], page 177: 'In case of ordinary personal property, where market value is sought, of course the most obvious resort is to evidence of what other similar property, whether wheat, shoes, horses, or what not, currently sold for on the market at that place. . . .' . . . This reasoning is particularly applicable to cases like the present one where the evidence consists of the price obtained at a sale of the *identical* property in question, because in such a situation the only problem as to similarity arises from the possibility that the character or value of the property may have changed between the time of the sale and the time as of which it is to be valued. . . .

"It is claimed that the price actually obtained is not sufficient evidence of value because respondents may not have followed proper marketing practices. . . .

". . . The matters urged by appellant to show that this evidence was untrustworthy go merely to the weight of the evidence and, under the circumstances of this case, do not compel its rejection." (See also *Eatwell* v. *Beck,* 41 Cal.2d 128 [257 P.2d 643]; *Nelson* v. *Marks,* 126 Cal.App.2d 261 [271 P.2d 900]; *Fleischer* v. *Cosgrove,* 145 Cal.App.2d 14 [301 P.2d 911]; *Goren* v. *Griffin,* 152 Cal.App.2d 35 [312 P.2d 743].)

The court has found, and the finding is supported, that the purchase and resale were in the same type of distressed market. That resale has been found to have been reasonably conducted. That finding is supported. The resale was at between 30 per cent to 60 per cent less than wholesale. While there is no evidence that this is a fair deduction to make in such a sale in such a market, if such were not a fair resale price, that was a matter of defense. Plaintiffs established a prima facie case by showing that the resale was made at a fair sale and

that but $19,000 plus was received at such sale. If defendants had any evidence that the resale price was not the fair value of the property they should have produced such evidence. This they did not do. In the absence of contrary evidence, the amount received at the resale of the property must be accepted as the reasonable value of the property as of the date of sale.

This disposes of defendants' major contention on this appeal. Other contentions are made, but they are without merit. Thus, it is contended that defendants are charged with misrepresenting the "average manufacturer's cost," and it is claimed that plaintiffs did not offer evidence on this issue. It is pointed out that plaintiffs were informed that the inventory in this respect was not only based on the prices contained in the Current Price Book, but on the plumbing company's invoices and inventories, where available. Plaintiffs proved that the manufacturer's cost computed solely from the Current Price Book was $29,000 plus. The invoices and other inventories were in possession of defendants. They had represented the "average manufacturer's cost" as $39,000 plus. They knew that prospective purchasers were not particularly interested in what Smith Plumbing and Supply Company had paid for the goods, but in their present value. The inventory was furnished to assist prospective bidders to bid on the goods based on present manufacturer's price. If the invoices and inventories, in possession of defendants, would have shown that the average manufacturer's price was different from the wholesale price less 30 per cent as reflected in the Current Price Book, this was a matter of defense. The fact that defendants made a mistake of $14,000 plus in computing the wholesale prices as such wholesale prices were reflected in the Current Price Book, was demonstrated. The "average manufacturer's price" was computed as 30 per cent less than wholesale, so that the error was necessarily carried over to this computation. Demonstrably, except for the first nine pages of the 47-page inventory, practically all the figures were incorrect. Thus, there was a negligent misrepresentation of a material fact. Any evidence, if such existed, to the contrary, was a matter of defense.

The finding that plaintiffs reasonably relied on the misrepresentations is amply supported. Defendants point out that plaintiffs were in the business of buying liquidated stocks of merchandise and in reselling them, and that they were permitted to and did examine the merchandise before they bid.

One of the plaintiffs had been engaged in this business for four years, and the other for five months. Of course, the issue of reasonable reliance was one of fact (*Blackman* v. *Howes*, 82 Cal.App.2d 275 [185 P.2d 1019, 174 A.L.R. 1004] ; *Lerner* v. *Riverside Citrus Assn.*, 115 Cal.App.2d 544 [252 P.2d 744]) and the court has found that plaintiffs reasonably relied on this misrepresentation. The evidence supports the findings. The stock of merchandise involved was a large and varied one, consisting of hundreds of items. The bids had to be submitted in a short time. Plaintiffs had dealt with the Board of Trade before and had always found the inventories furnished to be accurate and reliable. The inspection was devoted to determining the nature and extent of the stock, its condition and saleability. A spot check as to value was made of some of the items on the first nine pages of the inventory and these were found to be accurate. Plaintiffs relied on the representation as to wholesale value contained in the inventory furnished them in making their bid. ██ As was said in *Bagdasarian* v. *Gragnon*, 31 Cal.2d 744, 748 [192 P.2d 935] : ''An independent investigation or an examination of property does not preclude reliance on representations where the falsity of the statement is not apparent from an inspection, or the person making the representations has a superior knowledge, or the party relying thereon is not competent to judge the facts without expert assistance.'' Thus, the challenged findings are amply supported. The other contentions raised on defendants' appeal do not require discussion.

██ This brings us to plaintiffs' appeal. The plaintiffs contend that under the ''out of pocket'' rule of damages, the award to them should have been computed on the net amount received by them at the resale rather than on the gross amount received on the resale.

The evidence shows that the gross amount received by the plaintiffs on their resale was $19,873.25. The trial court also found that plaintiffs spent a total of $1,130.45 for rent, advertising, utilities, wages and salaries in connection with the resale. The court specifically found that these expenses were necessary to the sale and were reasonable in amount, but refused to include these figures in the computation of damages because, so it found, ''the paying and incurring of said expenses of sale were not proximately caused or occasioned by the facts heretofore found in these findings.''

The quoted finding is unsupported and contrary to law. Section 3343 of the Civil Code provides that the defrauded

party is entitled "to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received." This means that the defrauded party is limited to the difference between what he paid and the actual value of what he received—the so-called "out of pocket" rule of damages. It seems to have been the theory of the trial court that since plaintiffs paid $22,-696.99 for the property and subsequently resold it for a gross of $19,873.25, and since resale price is evidence of actual value as of the date of the original sale, expenses incurred after the original sale are not recoverable because not proximately caused by the fraud.

The reasoning is unrealistic and unsound. It is true that plaintiffs are limited to the difference between the amount paid and the actual value of what they received computed as of the day of original sale. It is equally true that the amount received on the resale is evidence of actual value as of the date of sale. But the fallacy in the reasoning is that the amount received on the resale was not the gross amount received, but the net amount received. Thus, plaintiffs proved that they grossed $19,873.25, but that in order to gross that amount they had to expend, necessarily and reasonably, $1,130.45. Thus, their proof was that the net amount received on the resale was $18,742.80. Thus, they were "out of pocket" not the amount of $2,823.74, but were also "out of pocket" an additional $1,130.45, making a total of $3,954.19.

It must be remembered that when plaintiffs purchased the goods from defendants everyone concerned knew that plaintiffs were purchasing for the purposes of resale. Everyone concerned knew that to hold a resale of the goods plaintiffs would have to incur expenses on such resale. The goods were of no value to plaintiffs unless resold. Therefore, the actual value to the plaintiffs of the goods on the day they received them was the amount they could get on a resale less cost of expenses of such resale, that is, the net amount received on such resale. Any other rule just would not make sense. The "out of pocket" rule seriously limits the defrauded party in the amount of damages he may recover. In most jurisdictions the defrauded party is entitled to damages measured by the value as represented—here $29,000 plus, and the actual value—here $18,000 plus—the so-called "benefit of the bargain" rule. California has seen fit to limit damages to the "out of pocket" rule. This is a matter of legislative policy and should, of course, be enforced by the courts. But

in enforcing that policy the courts should be careful to see that the plaintiff is awarded all of his "out of pocket" losses. The Legislature has said that plaintiff should not suffer a loss because of the defendant's fraud. Obviously, if plaintiff paid $22,000 plus for goods, for which he received $19,000 plus on a resale, and the resale, reasonably, cost him $1,000 plus, he is "out of pocket" $4,000 and not $3,000. If this were not the rule plaintiffs would have suffered an $1,130.45 loss—would have been "out of pocket" that much—for which they have not received reimbursement. That is contrary to the mandate of the code section.

There is no need to send this case back to the trial court to recompute the damages. There is no dispute over the material figures. It is therefore ordered that finding Number 12 is amended and corrected to provide that the value of the goods received from defendants was and is $18,742.80 and not $19,873.25, and that the damages suffered by plaintiffs were and are $3,954.19 and not $2,823.74. The conclusions and judgment are also amended and corrected to so provide. As so amended and corrected the judgment is affirmed, plaintiffs to recover their costs on both appeals.

Bray, J., and St. Clair, J. pro tem.,* concurred.

A petition for a rehearing was denied November 28, 1958, and the petition of defendants and appellants Board of Trade of San Francisco and W. J. Hempy for a hearing by the Supreme Court was denied December 23, 1958.

---

*Assigned by Chairman of Judicial Council.