[Civ. No. 26523.   Second Dist., Div. Two.   June 28, 1963.]

WAVERLY PRODUCTIONS, INC., Plaintiff and Appellant, v. RKO GENERAL, INC., Defendant and Respondent.

722

724

Laurence M. Weinberg and Stapleton, Weinberg & Isen for Plaintiff and Appellant.

Fendler, Gershon & Warner, Harold A. Fendler, Harry L. Gershon and Glenn Warner for Defendant and Respondent.

ASHBURN, J.—Plaintiff, Waverly Productions, Inc., appeals from an adverse judgment in favor of defendant RKO General, Inc., rendered in an action for declaratory relief which grew out of a motion picture distribution agreement between the two companies dated October 14, 1957.[1]  Plaintiff

---

[1]Defendant's corporate name then was RKO Radio Pictures, a division of RKO Teleradio Pictures, Inc.

agreed to produce two pictures having release titles "Enchanted Island" and "From the Earth to the Moon," and defendant was constituted distributor for both, its license to cover the entire world. Performance of the agreement would require expenditure of large sums of money by each party.

Appellant's major contention is that the instrument did not authorize defendant to enter into sublicenses for distribution in foreign countries and that the trial court erred in excluding parol evidence designed to establish and to resolve an ambiguity in the contract concerning said matter.

Under article (or paragraph) 3 of section IV of the instrument, defendant was given the exclusive right, license and privilege to distribute, exhibit and otherwise exploit the two pictures, "and to license others to do any of the foregoing." Distributor agreed to "use its best efforts to distribute each Picture covered by this agreement throughout the distribution territories in such manner as to obtain the greatest proper gross receipts from the distribution of the Picture that is justified by the quality of the Picture. The Distributor will distribute the Picture in accordance with its regular distribution practice which is current at the time involved. . . . In no event shall the Distributor incur any liability to the Producer hereunder based upon any claim by the Producer that the Distributor has failed to realize receipts or revenues which could or should have been realized, unless the Producer alleges and proves that such failure was due solely to the Distributor's action in bad faith."

Article 2 of section V: ". . . The Distributor may grant to other parties the right to make foreign versions at their own expense, to distribute such foreign versions in specified foreign countries and to deduct the expenses in connection with the preparation of such versions from the gross receipts before remitting the gross receipts to the Distributor."

Article 4 of section IV gives distributor the right to refrain from distributing or causing to be distributed either or both of the pictures in any foreign country if in its judgment such distribution would be unsound economically, or to discontinue such distribution when deemed by it economically desirable, or because of censorship or political difficulties.

Article 4 also provides: "Subject to the provisions of Article 3 of this Section, the Distributor or any distributor in its stead shall have sole and complete control over the dis-

tribution, exploitation and exhibition of each Picture covered by this agreement, which may be distributed under any plans which the Distributor deems expedient."

Article 9 of section IX: "Except as herein specifically provided, neither party hereto may assign this agreement in whole or in part, without the consent of the other. . . ." Then follow certain specified instances in which the producer may assign or either party may dispose of its right to receive or retain receipts from a picture or its interest in a picture.

Article 4A of section IV furnishes the subject matter around which this controversy mainly revolves. It says: "It is expressly understood and agreed that Distributor may assign or sub-license the distribution rights for a Picture to any distributor of motion pictures for distribution in any territory or territories other than the domestic territory [United States and Canada], or may enter into any plan or plans providing for joint distribution of the Pictures in such territories by Distributor and any such assignee or licensee. It is further expressly understood and agreed that Distributor may so assign, sub-license or transfer the distribution rights for a Picture for distribution in the domestic territory to any one or more of the following named distributors only: Loew's Incorporated, Twentieth Century-Fox Film Corporation, Paramount Pictures Corporation, Warner Bros. Pictures, Inc., Columbia Pictures Corporation, Universal Pictures Company, Inc., United Artists Corporation, or Buena Vista Film Distributors Corporation. In the event that Distributor is unable to arrange for domestic distribution of a Picture by any one or more of said designated distributors upon terms at least as favorable as those provided in Article 2(a) of Section VI hereof, then Distributor may so assign, sub-license or otherwise transfer the domestic distribution rights, or any portion thereof, for such Picture to any other distributor of motion pictures. . . ."

In March and June of 1958, defendant entered into sublicense agreements with Rank Film Distributors, Ltd., authorizing it to do the distributing of plaintiff's pictures in numerous European, Asian and South American countries. These were followed by similar concessions to Loew's International Corporation and to certain others for distribution in foreign countries. Plaintiff concluded that defendant was withdrawing entirely from distribution in foreign lands and instructed Technicolor, Inc. (which was processing the films)

to make no prints for RKO for distribution in foreign countries. This was about the 1st of October 1958, and was followed by this lawsuit which was filed on October 9, 1958.

As above indicated, plaintiff's major contention is that the first sentence of article 4A of section IV (quoted again in the footnote for convenience)[2] is ambiguous when read in the light of other provisions of the contract, and that the trial court's refusal to receive extrinsic evidence on that subject was prejudicially erroneous; that the real intention of same was that RKO would itself do the distributing in foreign countries.

The agreement concludes with the following paragraph: "13. This agreement constitutes the entire agreement between the parties and can be modified only by a written instrument duly executed by the authorized officers or representatives of each of the parties. No person has any authority to make any representation or promise on behalf of either party not contained herein and this agreement has not been executed in reliance on any such representation or promise."

There is no specific argument in appellant's opening brief that the language of 4A, standing alone, is ambiguous. Responsive to respondent's emphasis upon this matter, appellant's reply brief does essay an exposition of ambiguity within the confines of 4A, but finds uncertainty only in respects which do not bear upon the question of a right to make sublicenses for foreign territories.

Certainly this provision of the agreement does not present a patent ambiguity for the phraseology is not susceptible of two different meanings, especially is it not subject to the construction, standing alone, that RKO cannot sublicense the distribution in foreign countries.

When the words are susceptible to opposing interpretations, a form of latent (or mixed) ambiguity is said to arise (18 Cal.Jur.2d § 276, p. 765) and parol evidence may be received "not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties [citation], not to show that 'the parties meant some-

---

[2] "It is expressly understood and agreed that Distributor may assign or sub-license the distribution rights for a Picture to any distributor of motion pictures for distribution in any territory or territories other than the domestic territory, or may enter into any plan or plans providing for joint distribution of the Pictures in such territories by Distributor and any assignee or licensee."

thing other *than* what they said' but to show 'what they meant *by* what they said.' " (*Barham* v. *Barham*, 33 Cal.2d 416, 423 [202 P.2d 289].)

Upon the theory that a true latent ambiguity is raised by extrinsic evidence and hence can be removed by the same type of proofs, appellant's counsel approach the problem from two directions, first, that the contract must be read in its entirety and if uncertain of meaning after such a reading may be subject to parol proofs, and second, that the circumstances surrounding the execution of this agreement show that the intent of the parties was that RKO could not divest itself of an obligation to itself make distribution by sublicensing the distribution to others—an intent directly contrary to the language under discussion.

It is true that the agreement contains numerous provisions imposed upon RKO as distributor which require its personal performance, but those provisions presuppose that RKO will continue to do the distributing and they are all subject to the sublicensing provision of article 4A; when that privilege is exercised and a sublicensee takes over the distribution in a given area he necessarily becomes the active performer of the distributor's obligations *pro tanto*, but RKO as the primary distributor remains obligated to the producer to see that all those obligations are properly performed unless it procures a release thereof from Waverly, and there was no such release here. Incidentally, the agreement provides that RKO shall not be liable to Waverly upon any claim that it has "failed to realize receipts or revenues which could or should have been realized, unless the Producer alleges and proves that such failure was due solely to the Distributor's action in bad faith." The court found upon sufficient evidence that defendant was guilty of no bad faith in the premises.

Appellant's second approach toward resolving the asserted ambiguity is an arraying of negotiations (which in fact were merged into the contract) and an attempt thus to show the understanding and intention of Mr. Tevlin who negotiated the contract on behalf of Waverly. After negotiations extending over months and the ordinary drafts and redrafts of such an elaborate contract (62 pages in this instance) he examined the final draft and pronounced it satisfactory. But the defense nevertheless sought to show that his understanding

was that RKO was to distribute directly in foreign countries—
not through sublicensees.

Out of all the qualifications and uncertainties of the
parol evidence rule one proposition emerges clear and de-
cisive, namely, that the exclusionary rule is applicable "where
the *intention* of the parties with respect to their obligations
and rights is clearly stated in the writing, and parol evidence
of a *contrary intention* is offered." (Witkin, California
Evidence, § 374, p. 417.)

*Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 133-
134 [48 P.2d 13], is in point. We quote: "Other statements
of similar character were admitted. Together they amount
to nothing more than a statement of what Carver personally
believed the agreement of the parties to be. But it is now a
settled principle of the law of contract that the undisclosed
intentions of the parties are, in the absence of mistake, fraud,
etc., immaterial; and that the outward manifestation or ex-
pression of assent is controlling. This is the 'objective'
standard, established by the modern decisions and approved
by authoritative writers. [Citations.]. . . . The testimony
of Carver as to his intention is in direct conflict with the plain
meaning of the writings constituting the contract, and was
therefore incompetent and inadmissible under the parol evi-
dence rule. As the court said in *Payne* v. *Commercial
National Bank,* 177 Cal. 68, 72 [169 P. 1007, L.R.A. 1918C
328]: '. . . no authority sustains the proposition that under
the guise of construction or explanation, a meaning can be
given to the instrument which is not to be found in the instru-
ment itself, but is based entirely upon direct evidence of
intention independent of the instrument.' [Citations.]"

*Imbach* v. *Schultz,* 58 Cal.2d 858, 860-861 [27 Cal.Rptr. 160,
377 P.2d 272]: "Although parol evidence is ordinarily ad-
missible to explain the meaning of an agreement, it is not ad-
missible when it is offered, as here, to give the terms of the
agreement a meaning to which they are not reasonably sus-
ceptible, and this is especially true where the evidence con-
sists of a declaration of a party as to what he intended the
language of the specific document to mean. (See Rest.,
Contracts, § 230 and coms. a, b; *id.,* § 235, cls. (a), (d) and
coms. a, f; *id.,* § 242 and com. 2; 4 Williston on Contracts
(3d ed. 1961) § 610, pp. 499-503; *id.,* § 610A, pp. 517-519; *id.,*
§ 629, pp. 923 et seq.; 9 Wigmore on Evidence (3d ed. 1940)

§ 2471, pp. 229-230; Witkin, California Evidence, § 370, p. 412.)

"The trial court obviously based its interpretation of the contract on the extrinsic evidence introduced by defendants in regard to what was said by their attorney. Under the principles discussed above, that evidence, particularly since it related to a declaration of defendants through their attorney as to what their intention was, cannot be used to give the written agreement a meaning to which it is not reasonably susceptible."

█ Witkin on California Evidence, section 370, page 412: "(b) *Evidence of Intention Excluded.* There is a fundamental limitation on the admissibility of evidence to interpret a writing: Extrinsic evidence of *intention* must be excluded. Once the writing is accepted as a final expression of a contract or a will, any declarations or testimony of intention contrary to its express terms do not give it meaning but substitute a different meaning, and they are consequently excluded."

Sensing the heavy burden of establishing their major proposition that 4A forbids sublicensing of foreign exhibition although its language is unmistakably to the contrary, counsel for appellant advance the secondary argument that their claim of an obligation on RKO to itself distribute in foreign territory "is subject to the limited qualification that RKO was permitted to make sub-distribution agreements" and that that term has a "special and extremely limited meaning," namely, "the testimony would have been to the effect that sub-distribution refers to arrangements for the marketing of pictures in territories where for political or economic reasons the distributor has difficulty in distributing directly." This seems to be a reference to the sentence of article 4 reading: "It may refrain from distributing any Picture in any country or portion thereof or may withdraw it from distribution in any country or portion thereof if, in its discretion, it seems advisable because of censorship or political difficulties." This matter of "sub-distribution" in the special sense of appellant is not mentioned in the complaint, or in the joint pretrial statement or order and has no substantial basis in logic or in the terms of the agreement.

█ The language of article 4A here under consideration is so crystal clear that he who runs may read. There was no error in excluding the parol evidence in question.

Appellant insists that the sublicenses granted by respondent for foreign territories were not sublicenses at all, inferentially claims they are assignments and as such forbidden by the agreement constituting defendant the main distributor for plaintiff's two pictures. We think it immaterial whether they are sublicenses or partial assignments. It appears that the joint statement on pretrial does refer to them as assignments. Appellant relies upon the provision of article 9 of section IX: "Except as herein specifically provided, neither party hereto may assign this agreement in whole or in part, without the consent of the other. . . ." Obviously an assignment of part of an agreement means transfer to another of less than all of its benefits or burdens. Article 9 says this cannot be done "except as herein specifically provided." One such specific provision is found in article 4A: "It is expressly understood and agreed that Distributor may assign or sub-license the distribution rights for a Picture to any distributor of motion pictures for distribution in any territory or territories other than the domestic territory. . . ." Plainly this contemplates transfer of benefits or burdens. It is the burdens with which appellant is concerned. But such a transfer of burden does not relieve the assignor of the obligation unless the other contracting party consents thereto (*Britschgi* v. *McCall*, 41 Cal.2d 138, 144 [257 P.2d 977]), and there was no such consent here. The court found in effect that no release of RKO resulted from an assignment, and respondent's brief says: "RKO has never contended that it absolved itself from liability to Waverly when it executed the sub-license agreements." Whether a sublicense or a partial assignment, the result is the same so far as this case is concerned.

Appellant endeavors to hold RKO as a trustee or other fiduciary which has not borne its burden of accounting and proving that it has acted in good faith. It is argued that RKO completely withdrew from foreign distribution (the court found to the contrary) and did so in order to avoid further losses from that phase of its business. The court held it acted in good faith and that it was not a fiduciary except with respect to accounting for rentals received from its sublicensees. This is undoubtedly correct.

The contract is an elaborate one which undertakes to define the respective rights and duties of the parties, and specifically confers upon defendant the sublicensing privilege, ex-

ercise of which forms the basis of appellant's charge of viola-
tion of fiduciary duty. ▮▮ A mere contract or a debt,
does not constitute a trust or create a fiduciary relationship.

▮▮ *New* v. *New*, 148 Cal.App.2d 372 [306 P.2d 987], is
in point. It involved a property settlement agreement
through which the husband (defendant and "second party")
received participation interests in Continental Corporation
and Continental Development Corporation and agreed to
" 'pay first party twenty-five per cent (25%) of any and all
sums, proceeds, benefits, remunerations, compensation and
emoluments of whatsoever kind or nature . . . paid to sec-
ond party or that second party may receive, or paid to or
received by others for the use and benefit of second party,
directly or indirectly, from the said Continental Corporation,
the Continental Development Corporation, their successors,
subsidiaries or assigns, or from any of them by virtue of any
interest which second party presently has in said Continental
Corporation, Continental Development Corporation or which
he may have. . . .' " (P. 376.) The wife claimed that this
made the husband a trustee or other fiduciary for her and
that he had acquired for himself a profitable business oppor-
tunity which he should have obtained for the corporation
and that hence he violated his duty to her. The court said,
at pages 381-382: "Counsel for appellant concede in their
briefs that 'since the property settlement agreement did not
contain a declaration of trust, it was not an express trust.'
But they insist upon some implied fiduciary obligation in the
nature of a trust,—a 'voluntary trust.' We perceive no basis
for this. Defendant's obligation to plaintiff was to pay her
a percentage of anything received by him from Continental
or Development, directly or indirectly. When received, he
owed her 25 per cent of it, just as if he had agreed to
pay her $500 cash per month if he received that much from
any source. Defendant was not obligated to create a "cor-
porate opportunity' or to remain a corporate officer or
director or so to manage the corporation as to make the stock
lucrative. His primary obligation was negative, to refrain
from conduct calculated to deprive plaintiff of the legitimate
fruits of her bargain." At page 382: " 'There was and at
all times has been, an implied term in said Property Settlement
Agreement, and particularly in paragraph 14 thereof as em-
bodied in said Interlocutory Judgment of Divorce, that
neither party would do anything to deprive the other of the

fruits and benefits thereof.' '' And the court then said: ''This is an implied term of every contract. 'In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. (17 C.J.S. 778, § 328.)' (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665].) Being of universal prevalence it cannot create a fiduciary relationship; it affords basis for redress for breach of contract and that is all. (See *Gonsalves* v. *Hodgson*, 38 Cal.2d 91, 97-98 [237 P.2d 656].) The trial judge properly ruled that the stock in Continental and Development was not held by defendant for the use or benefit of plaintiff.'' (Pp. 382-383.)

*Gonsalves* v. *Hodgson*, 38 Cal.2d 91 [237 P.2d 656], an action for breach of contract to construct a fishing vessel. ''Taken in its entirety, this cause of action appears to be for breach of a contract based upon a fiduciary relationship.'' (P.94.) The court said, in part: ''The conclusion is inescapable that no trust relationship was created by the contract, or by the dealings of the parties under it.'' (P. 97.) And: ''The contention of Gonsalves and his associates seems to be that a fiduciary relationship arose out of the promise to construct the vessel in a 'workmanlike' manner, in dependence upon the special knowledge and skill of Hodgson. But his knowledge or skill was not property which might be held in trust. It could be the subject only of a contractual obligation.

''Nor was there here any fiduciary relationship between the parties. As is said in 1 Bogert, Trusts and Trustees, section 17, '. . . there is no fiduciary relation in the case of debt or other contract duty. The rights and duties of parties to a contract may generally be freely transferred. The trustee cannot assign his trusteeship or delegate the performance of his duties. . . . There is no rule that parties to a contract may not act for their own interest during the execution of the contract. They have no duty of loyal representation of the opposing party in the relationship.'

''The parties here were engaged in a course of arms-length dealing. Hodgson was to use his knowledge and skill in the supervision of the construction. Gonsalves and his associates

were given, and exercised, a supervisory check on all phases of construction. They retained rights of control which completely negative any implication of a fiduciary relationship.

"There being no trust or fiduciary relationship, the only breach which could have occurred would have been one of a strictly contractual obligation." (Pp. 98-99.)

*Downey* v. *Humphreys,* 102 Cal.App.2d 323 [227 P.2d 484], was an action brought by the liquidator of an insurance company against an agent to recover unremitted insurance premiums. A nonsuit was granted, the trial court holding that the agent was not a trustee and had a right to offset unearned premiums. The court said, at page 332: "A debt is not a trust and there is not a fiduciary relation between debtor and creditor as such. If a person receives money and it is the intention that he shall have the unrestricted use thereof, being liable to pay a similar amount to a third person, a debt is created. [Citations.] If funds held by an agent are commingled with the knowledge and consent of his principal, in the absence of an agreement to the contrary, the inference is that the agent becomes a debtor to the amount received for the principal."

(See also, 48 Cal.Jur.2d § 17, p. 666; 89 C.J.S. § 59, p. 828; Rest. 2d Trusts, § 12, p. 35.)

We think it clear that RKO was not a fiduciary with respect to the performance of the terms of this contract (except as to accounting for rentals received) and that arguments predicated on the assumption that it was are directed to a false issue.

We cover herein the three questions which, according to appellant's reply brief, present the essence of this appeal.[3] Numerous subsidiary arguments of appellant must fall of their own weight because they rest upon the assumption that RKO, not Waverly, defaulted in performance of its obligations under the agreement.

After the two pictures were completed and the facilities for making reprints for exhibition purposes had been turned over to Technicolor, Inc., "RKO ordered foreign re-

---

[3] "These questions are: First, did the Trial Court commit error in its interpretation of the Distribution Agreement and in the exclusion of extrinsic evidence for the purpose of interpretation? Second, was RKO guilty of bad faith toward Waverly in its effort to dispose of foreign distribution rights for the two Waverly pictures? and Third, did the Trial Court commit error in holding that the Technicolor charge was a cost of production and therefore an obligation of Waverly?"

lease prints from Technicolor, and Waverly, claiming that RKO was in violation of the Distribution Agreement, instructed Technicolor not to honor RKO's orders," as stated in appellant's opening brief. This claim was based upon the primary one that RKO had no right to sublicense the distribution of the pictures in foreign countries. As heretofore shown, this latter contention is unsound. Hence Waverly, without legal cause, made it impossible for RKO or its sublicensees to exhibit the pictures or to earn the contemplated revenues, thus violating the settled principle that "[i]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665].) Clearly plaintiff violated its agreement and is in no position to complain of alleged deficiencies in defendant's preliminary and partial performance upon which appellant did not rely when obstructing defendant's reaping the proceeds of exhibiting the pictures through its sublicensees.

Appellant further says in its brief that "the case went to trial on the fundamental question as to whether RKO could insist upon having Technicolor honor its orders for the preparation of release prints for release in the foreign territory." The trial judge correctly answered this question in the affirmative. It is unnecessary for this opinion to follow and discuss the many divagations of appellant's main arguments; they are adequately disposed of through the treatment of its principal contentions.

Waverly refused and failed to pay the sum of $25,589.03 which Technicolor claims and the court found to be a production cost. Plaintiff had agreed to pay all costs of production and defendant "all direct distribution expenses." The joint statement on pretrial, which was incorporated in the court's order, says: "Technicolor Corporation has rendered certain laboratory services in connection with said photoplays, and has demanded payment of the sum of $25,589.03 in payment thereof. Neither RKO nor Waverly has made any payment on account of said demand. Technicolor Corporation has asserted a lien upon certain physical properties of said photoplays in order to enforce said demand."

Appellant claims the finding is erroneous because not supported by any evidence. The argument overlooks the fact that the agreement provides that Waverly shall deliver to RKO answer prints, picture negatives, protective master positive prints, sound track negatives, dubbing prints and minus dialogue sound track negatives, same to be prepared "by the laboratory which is to do the production laboratory work." It was stipulated that Technicolor prepared a composite negative and one answer print for each picture. Mr. Bogeaus, president of Waverly, testified that Technicolor had also prepared the protective master positive prints and the foreign sound track negative. In the absence of other evidence the foregoing was sufficient to sustain the court's finding: "That the aforestipulated charge of $25,589.03 asserted by Technicolor is not an expense of distribution of the Pictures which RKO is obligated to advance under the Distribution Agreement; said charge is a part of the cost of production of the Pictures which Waverly was obligated to pay under the Distribution Agreement."

It is to be remembered that this is a controversy between Waverly and RKO, that Technicolor is not a party to the action or bound by its result. The question is whether, as between themselves, plaintiff or defendant should discharge this obligation. Even if it be conceded *arguendo* that this was a direct distribution expense, it is plain that RKO was required to advance such cost (sec. V, art. 5) and "be reimbursed as provided in Article 3 of Section VI hereof," which reads: "After the Distributor recoups the distribution fees (other than deferred fees) referred to in Article 2 above, the remainder of the gross receipts of a Picture covered by this agreement shall be applied to reimburse the Distributor for the direct distribution expenses in connection with such Picture." Plaintiff having made it impossible for defendant to procure the prints necessary to produce those gross receipts and having thereby breached its agreement, it necessarily follows that, as between the parties to this action, plaintiff must bear the expense in question.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied July 23, 1963, and appellant's petition for a hearing by the Supreme Court was denied August 20, 1963.