[Civ. No. 29634.   Second Dist., Div. Four.   Feb. 27, 1967.]

JOANACO PROJECTS, INC., Plaintiff and Appellant, v. NIXON & TIERNEY CONSTRUCTION COMPANY et al., Defendants and Respondents.

Harry S. Cogen for Plaintiff and Appellant.

Booth, Mitchel, Strange & Willian, George C. Mitchel and Kenneth T. Purcell for Defendants and Respondents.

JEFFERSON, J.—This action, for damages based on fraud and unjust enrichment, was brought by Joanaco Projects, Inc. against Nixon & Tierney Construction Company and against its two stockholders, John Tierney and Donald Nixon. The trial was by the court sitting without a jury. Upon the completion of the presentation of plaintiff's case, defendants moved for a judgment under the provisions of Code of Civil Procedure section 631.8.[1] The motion was granted by the court and judgment was entered thereon. Plaintiff appeals, contending the evidence is insufficient to support the judgment. We have concluded that plaintiff's position is correct and that the judgment must be reversed.

These facts were admitted in a joint pretrial statement: In 1958 plaintiff acquired a parcel of land in the Brentwood area of West Los Angeles. It subdivided the land into a tract con-

---

[1]Code of Civil Procedure section 631.8 provides:

"After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make findings as provided in Sections 632 and 634 of this code, or may decline to render any judgment until the close of all the evidence. Such motion may also be made and granted as to any counterclaim or cross-complaint.

"If the motion is granted, unless the court in its order for judgment otherwise specifies, such judgment operates as an adjudication upon the merits."

sisting of 34 lots. On November 6, 1961, plaintiff and defendant corporation entered into an escrow agreement whereby plaintiff agreed to sell and defendant agreed to buy two contiguous unimproved lots in the tract, identified as Lots 29 and 31. By the terms of the agreement defendant corporation was to pay for each lot the sum of $18,750, payable $6,250 in cash and the balance of $12,500, to be evidenced by a promissory note secured by a trust deed on each property.

The escrow agreement also contained the provision that plaintiff agreed to subordinate the two trust deeds to two trust deeds thereafter to be executed by defendant corporation to secure two loans not exceeding $35,000 each. The escrow instructions provided that the trust deeds to be delivered to plaintiff would each contain the following subordination provision: "This Deed of Trust, shall, provided no notice of default under the terms hereof then appears of record, be subject to a deed of trust to be hereafter executed by the trustors or their successors in interest covering said land and securing a loan, not exceeding $35,000.00, made primarily for the purpose of the payment of (a) the costs, including but not limited to loan, brokerage and insurance fees, of obtaining such loan; (b) the costs of construction of improvements on said land; and (c) interest on such loan; such loan to be evidenced by a promissory note or notes bearing interest at not more than 6.6% per annum plus any late charges and/or penalties and payable over a period of not to exceed 25 years. Upon recordation of such construction loan deed of trust it shall conclusively be deemed that the entire amount thereof has been or will be used for or applied to the aforesaid purposes for which such loan was made, except, however, that any proceeds of such loan remaining in possession of the lender after all such payments have been made, shall be paid to the borrowers, their successors or designees."

The escrow was thereafter completed. Pursuant to its terms on November 27, 1961, defendant corporation gave plaintiff two promissory notes, each in the principal amount of $12,500, evidencing the balance of the purchase price of each of the lots. One of the notes was secured by a deed of trust on Lot 29, the other by a deed of trust on Lot 31. They were recorded on December 15, 1961. Each deed of trust contained the subordination provision above quoted.

On January 4, 1962, defendant corporation obtained two loans from Home Savings and Loan Association, each in the

amount of $35,000; two promissory notes were executed and delivered, each in the amount of $35,000, one being secured by a trust deed on Lot 29 and the other by a trust deed on Lot 31. As provided in plaintiff's subordination agreement each of the trust deeds was senior to plaintiff's trust deeds.

Defendant corporation proceeded with the construction of residences on the two lots. Notice of completion was recorded on March 7, 1962. Defendant, however, made no payments of either principal or interest on the promissory notes executed by it in favor of plaintiff and the trust deeds became in default. Nor did defendant make any payments to Home Savings and Loan Association on the two loans of $35,000, and the properties were sold on foreclosure proceedings instituted by Home Savings. The latter purchased the lots, bidding $38,029.16 for Lot 29 and $38,369.58 for Lot 31. Lot 29 was resold on October 7, 1963, for $38,495.86, and Lot 31 on October 30, 1963, for $39,686.34.

The foreclosure sales by Home Savings wiped out and rendered valueless the second trust deeds held by plaintiff. Being purchase money trust deeds (as defined in Code Civ. Proc., § 580b), plaintiff was not entitled to a deficiency judgment against defendants.

Testimonial and documentary evidence was introduced that, out of the total of $70,000 paid by Home Savings to defendants on both loans, the sum of $35,136.73 was expended by defendants for the costs of improvements on the two lots.[2] This figure also included loan fees, escrow costs, interest and principal payments, plus taxes. Approximately one-half of this amount was expended on each lot. The balance of the loans, namely $34,863.27, was retained by defendants.

There was testimony that in addition to the $35,136.73 expended, approximately $10,000 was disbursed to Western States Constructors, a corporation organized by defendants Nixon and Tierney to supervise the construction, for work performed by Nixon and Tierney on the property.

Defendant corporation, although incorporated on November 19, 1959, issued and sold all of its outstanding shares of stock on October 20, 1961 (about two weeks before entering into the escrow agreement with plaintiff). One hundred shares of capital stock were sold at a price of $10 per share. Donald

---

[2]Defendants' accountant testified that his books indicated that defendants had spent a total of $39,420.73. However, defendant Nixon later testified on cross-examination that one item of $4,284 had been improperly credited to the total, leaving the balance of $35,136.73.

Nixon paid $500 for 50 shares and John Tierney paid $500 for the other 50 shares. Nixon was the president and treasurer and Tierney was the vice-president and secretary of the corporation.

. The principal thrust of plaintiff's attack on the judgment centers on the finding of the court that, ''Nixon and Tierney Construction Company did use the proceeds of each of the loans obtained from Home Savings primarily for the purpose of payment of (a) the costs, including but not limited to loans, brokerage and insurance fees, of obtaining such loans; (b) the cost of construction of improvements on said land; and (c) interest on such loans.''

The theory of the plaintiff's case was that defendants had warranted and represented in the escrow instructions the purpose for which the loans were to be used; they would use substantially all of the proceeds for improvements on the property; it was only because of this representation that plaintiff agreed to subordinate its trust deeds. Plaintiff sought to show that defendants had no intention of doing what they had represented; that, at all times, it was their intention to ''throw up'' substandard houses on the lots, using as little of the loan proceeds as possible, and then to walk off with the balance of the proceeds, as a profit, leaving plaintiff ''high and dry'' with no recourse against them.

Donald Nixon, a college graduate, testified that through various corporate entities he had constructed approximately 200 houses prior to building the homes on the lots he purchased from plaintiff. All of the lots upon which the 200 homes were built were acquired pursuant to subordination agreements, whereby the sellers subordinated ''to construction loans.'' The negotiations to purchase the lots from plaintiff were conducted through a broker. The latter told Nixon that plaintiff would be willing to subordinate ''to a construction loan.'' The escrow agreement was thereafter drawn up, the subordination clause being inserted by plaintiff.

. The agreement called for the submission of plans by defendants for the approval of plaintiff. However, the plans did not specify the cost of or the quality of the material to be used. Nixon testified that he could spend ''anywhere from $6 to $20 a square foot and achieve the same objective with those plans.'' Nevertheless, he testified that it was his understanding that he needed to expend only an amount necessary to construct the homes in accordance with the plans submitted to

and approved by plaintiff. In applying for the two construction loans, he admitted that he gave a cost breakdown to Home Savings and Loan Association which estimated the cost of construction of each house at $35 000. At one point in his testimony Nixon indicated that he believed the value of each house constructed would have to be at least equal to the amount of the first and second trust deeds, plus the expenses of sale. Later, he testified that he did not believe it was his obligation to construct homes of this value. In this connection, excerpts from his deposition were read into the record by counsel for plaintiff:

"Q. Mr. Nixon, was it your understanding that you could use any funds that you obtained from Home Savings & Loan or any other lending institution to which this trust deed would be subordinated, for any purpose other than those stated in the escrow instructions in the quoted provisions? A. Yes.

"Q. For what other purpose or purposes other than those stated in the escrow instructions? A. It was my understanding that the funds could be used for any purpose that the corporation saw fit to spend them on in the line of business.

"Q. On what information or facts did you or do you base that understanding? A. On the fact that this is generally an accepted practice in this type of business.

"Q. Well, is it your opinion, Mr. Nixon, that the $35,000 construction loan you received from Home, that Nixon & Tierney Construction Company could use it for example to make loans to officers, directors, stockholders or to invest in other projects? A. Point one, I don't hold that it was a construction loan. Point two, my opinion as to what—this is a hypothetical question which I don't feel is relevant. What the money could be used for and what it was used for is two different things.

"Q. You say you didn't take this to be a construction loan and that you obtained from Home Savings? A. I took it to be a loan, period.

"Q. And not a construction loan? A. That is right.

"Q. You could use all or any part of it as you saw fit and when I say you in this instance I'm referring to the corporation. You could use it in any way you saw fit and use as much of it or as little of it for the construction of residences on these lots, that is your understanding of it? A. It would be my understanding that we would use as much as was required to accomplish the purpose. If it took all of it or more, then that would be it.

"Q. You say to accomplish the purpose. What purpose?
A. Of making the improvements on the property."

Nixon further testified that as of November 30, 1961 (a few weeks after the date of the escrow agreement), the balance sheet of Nixon and Tierney, Inc. showed a total capital of $981. As of July 15, 1962, it had a capital deficit of $13,754. That deficit remained to the date of the trial, and the corporation engaged in no further business activity after building the two houses.

A disbursement officer at Home Savings testified that the loan proceeds credited to the account of Nixon and Tierney, Inc. remained on deposit with Home Savings and were disbursed by a voucher system. Home Savings had a policy not to disburse any money to an owner-builder except to reimburse him for money advanced and expended by him; he would not be entitled to any profit factor in the loan until construction was completed and the loan period had expired. Under the voucher system payments were made on vouchers drawn by defendant corporation to subcontractors, materialmen and to defendant corporation itself where it could furnish evidence of prior payment and entitlement to reimbursement.

An appraiser for Home Savings testified he made an appraisal of Lots 29 and 31 after the residences were completed. He was of the opinion that while the other residences in the tract where these homes were located had a market value ranging from $45,000 to $65,000, these properties were each worth about $36,000. The exteriors of the two houses were far below standard. The materials were of minimal quality when compared to the neighborhood standard. The interiors were also far below standard, the built-ins being of minimum apartment house quality. The stove and oven in particular were so "unique" that he photographed them. He had never seen such appliances installed in houses before, only in boats and house trailers.

A second appraisal of the properties was made by a real estate broker whose office handled the sale of the two houses after foreclosure by Home Savings. He testified that in his opinion the other houses in the tract had a value from $47,500 to $65,000; the two houses on Lots 29 and 31 had a value of $37,500.

George Pecora, defendants' accountant, pursuant to *subpoena duces tecum,* produced the financial records of Nixon & Tierney, Inc. The voucher register contained a schedule of

vouchers submitted to Home Savings for payment of the two loans. In connection with several individual voucher stubs naming Western States Constructors as payee (in accounts which totaled about $10,000), he recorded the items in the voucher register as payments made instead to Nixon & Tierney, Inc. He testified that amounts shown on these vouchers were charged to "cash exchange," meaning it was received by Nixon and Tierney and deposited in the corporation's bank account. He disregarded the notations appearing on the voucher stubs purporting to show expenditures for grading, cabinet work, etc., because there were no checks issued or payments made by defendant corporation to support such expenditures.

Defendant Nixon was recalled as a witness by plaintiff, and questioned at length in regard to the accuracy of the bills and invoices submitted by Nixon & Tierney, Inc. to Home Savings in support of vouchers calling for reimbursement to Nixon & Tierney, Inc. He testified in part as follows:

"Q By Mr. Cogen: Mr. Nixon, with respect to Voucher No. 7, Lot 29, the supporting documents attached thereto are all furnished by you or Mr. Tierney in support of the request for that payment, is that correct? A Yes.

"Q Did you represent or intend to represent to Home Savings and Loan that payment had been made of these bills, both labor and material and so forth, and you were asking for reimbursement? A We intended to represent that these particular items, whether they be — I believe this is misc., the concrete work, et cetera, was complete. We did not necessarily intend to represent that we spent the amount of the invoice or that we paid that amount, although the invoices would appear to indicate that.

"Q By Mr. Cogen: Then I take it, Mr. Nixon, that you felt justified in sending in, in approving the sending of this letter and listing these various trades or to whom payment had been made, but that the figures on the right-hand side of that letter were not necessarily the amount that you paid? A That's correct.

"Q Well, let us take some of the big ones like concrete foundation, plumbing, brick and stone work. There is no question that those are not correct? A Yes. Those, those items were not paid in that amount.

"Q The brick and stone work was done by Mr. Appleby, wasn't it? A Yes.

"Q The total amount that you paid Mr. Appleby, according to Plaintiff's Exhibit No. 22, was $620 for both houses, wasn't it? A I believe that's correct.

"Q Whereas the amount shown on the letter of January 24 shows a total of $2150? A Yes.

"Q Isn't the same thing true with respect to most of these other items? A Well, it is true of some of the other items.

"Q All right. And that even though there may have been invoices purporting to show an amount equal to the amount shown in the letter, those invoices were not true and accurate, isn't that true? A Yes, that's correct.

"    .   .   .   .   .   .   .   .   .   .   .   .

"Well, in any event, Mr. Nixon, let me just move it along a little bit. Let us look at Exhibit 23. In that connection the voucher was issued to Nixon & Tierney for $3900, and you received payment of that amount. did you not? A. I believe we did.

"Q And attached to it as the first invoice is the photocopy of Mr. Appleby's bill in the amount of $4300 covering both lots. It says Jobs 1135 and 1127 Norman Place.

"Now, it is true that as you testified before that that billing is completely inaccurate, and that no more than $620 was paid for both lots, is that correct? A To Mr. Appleby, that is correct.

"Q What about this billing here from Jerry Witt & Sons for roofing and sheet metal work in the amount of $2,300 on both jobs. Is that a correct billing? A May I see Mr. Pecora's —

"Q Let us see if I can find it here. All right. I direct your attention, Mr. Nixon, to Plaintiff's Exhibit 22 and Page 2 thereof, Line 37 which shows a check issued by Nixon & Tierney Construction Company for roofing to Jerry Witt & Sons in the amount of $675; and that covers both lots, does it not? A I believe it does, yes.

"Q All right. So that this bill or photocopy of the billing of Jerry Witt & Sons directed to Nixon & Tierney Construction Company in the amount of $2300 is not a true and correct billing, is it? A That is correct.

"Q Attached to the same exhibit, namely Exhibit No. 23, is a photocopy of an invoice from — is that H. G. Pangborn Corporation? A That is correct.

"Q That is for heating, is it not? A Yes.

"Q The heating installation? A Yes.

"Q And that is addressed to Nixon & Tierney, and that shows 'Rough in 50 per cent of contract price $2,400, amount due $1,200;' and that covers, according to the invoice job address, both lots, does it not? A Yes.

"Q All right. Now, I direct your attention to, as contrasted with the contract price of $2400, to the analysis prepared by Mr. Pecora, Plaintiff's Exhibit No. 22 on Page 3, Lines 1 and 2, showing total payments, presumably for both lots of $820, is that right? A Yes, that's correct.

"Q Is it true then, Mr. Nixon, that the billing of $2400 or the billing showing a purportedly contract price of $2400 attached to Exhibit 23 is fictitious? A It is not a correct billing for the amount that was actually paid, no.

"Q And weren't you aware of the fact — A Yes.

"Q — that that was not the correct amount that you proposed to pay? A Yes."

Saul Cogen testified that he and his wife were the sole stockholders of plaintiff. He had suggested the language used in the subordination agreement. He is admitted to practice law but has not practiced since 1943. He relied on the terms of the agreement and expected that all or substantially all of the construction loan proceeds would be used for construction. Otherwise, he would not have agreed to subordinate plaintiff's purchase money trust deeds. His first inspection of the two houses followed defendants' default in payments due in March 1962.

■ Inasmuch as the agreement between the parties was in writing, its interpretation presents a question of law; the finding of the court below as to its proper construction is not binding on us. (*Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ Whatever the amount of the loan proceeds actually expended by defendants on improvements on the two lots, whether it was $35,000, or $45,000 if the amount paid to defendants' corporation Western States Constructors is considered, it cannot be said that the loan proceeds were "primarily" used for construction improvements as the trial court found. While it is true the dictionary definition of the word "primarily" — "1. First of all: fundamentally, principally. 2. in the first place; originally." (Webster's Third New International Dictionary, unabridged) — indicates it may be used to mean "in the first place" or "originally," it is obvious that

the word was not used in this sense here. The loans were specifically referred to in the subordination agreement as "construction" loans. This was their acknowledged purpose. Requiring, as part of the agreement to subordinate, that the bulk of the loan proceeds must go to improve the value of the land, is the only way—as this case so clearly demonstrates—that a seller can insure that he will not lose both his land and the purchase price. Under the terms of the subordination agreement, the loan funds were to be used "principally" for improvements on the land. The evidence in this case shows this was not done; that defendants "walked away" with approximately $35,000 out of the total of $70,000.

As we interpret the agreement, the defendant corporation agreed to borrow money from Home Savings for the purpose of improving the real property and agreed that the money borrowed would be used for that purpose. The findings of fact made by the trial court appear to have been based upon a different interpretation of the contract, and one which we consider erroneous.

The evidence shows without conflict that a substantial part of the money borrowed was not used for the purposes which had been agreed upon between plaintiff and defendant corporation. It follows as a matter of law that defendant corporation breached its agreement with plaintiff.

The evidence as a whole also shows without conflict that defendants never intended to perform their contract. Even the testimony of defendant Nixon supports the view that defendants never intended to devote all or substantially all of the borrowed funds to the purposes specified in the agreement. What they did was what they had intended to do from the beginning. The promise was made without any intention to perform it. ■ "A promise to do something necessarily implies the *intention to perform*, and, where such an intention is absent, there is an implied misrepresentation of fact, which is actionable fraud. [Citations.]" (2 Witkin, Summary of Cal. Law (1960) § 192, p. 1377.)

■ Further, "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. [Citation.]" (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665];

*Waverly Productions, Inc.* v. *RKO General, Inc.*, 217 Cal. App.2d 721, 733 [32 Cal.Rptr. 73].) Defendants' acts clearly violated this implied covenant.

The subordination clause contains the following last sentence: ''Upon recordation of such construction loan deed of trust it shall conclusively be deemed that the entire amount thereof has been or will be used for or applied to the aforesaid purposes for which such loan was made, except, however, that any proceeds of such loan remaining in possession of the lender after all such payments have been made, shall be paid to the borrowers, their successors or designees.'' Defendants contend that the inclusion of this clause in the agreement manifested an intention of the parties to avoid any issue as to the manner in which the loan funds were actually used; that there was created a conclusive presumption to this effect which prohibited the introduction of evidence to vary the presumption; and that, in any event, this clause indicates that plaintiff did not intend to rely on the restrictions provided in the subordination agreement for protection of the value of its trust deeds. The language which defendants rely upon was language which the parties had agreed would appear in the construction loan deed of trust. It therefore does not necessarily reflect the terms of the promises made by the defendant corporation to the plaintiff. We regard the language as intended to protect the lending agency which furnished the construction funds, against a suit by the holder of the subordinated deed of trust (see *Collins* v. *Home Savings & Loan Assn.*, 205 Cal.App.2d 86 [22 Cal.Rptr. 817] and *Gill* v. *Mission Savings & Loan Assn.*, 236 Cal.App.2d 753 [46 Cal. Rptr. 456]),[3] and not to afford defendants as purchaser-borrowers an immunity from their own misconduct. To construe this language as defendants ask would render valueless all of the prior provisions limiting the purposes for which the loan proceeds were to be used. The evidence is clear that plaintiff did not intend to relieve defendants of their responsibility to use the loan funds in such a manner as not to endanger or to wipe out plaintiff's security interest.

One other point bears discussion. Although plaintiff's contract was consummated only with defendant corporation, the individual defendants Tierney and Nixon were active partici-

---

[3]Since the rights of plaintiff as against the lending agency are not herein involved, we do not reach the question of whether or not the language used would have been effective to accomplish the result apparently intended.

pants in the transaction. ██ "Every person connected with a fraud is liable for the full amount of the damages. Thus, individuals who are parties to the consummation of a fraud are equally responsible with the person with whom a contract induced by the fraud is made." (23 Cal.Jur.2d, Fraud and Deceit, § 47, pp. 114-115. See *Conlin* v. *Studebaker Bros. Co.*, 175 Cal. 395, 398 [165 P. 1009].)

The judgment is reversed.

Files, P. J., and Kingsley, J., concurred.