[Civ. No. 288.    Fifth Dist.    May 12, 1964.]

BALFOUR, GUTHRIE & CO., LTD., et al., Plaintiffs and Respondents, v. CLIFFORD L. HANSEN et al., Defendants and Appellants.

Park & Shenk, Samuel C. Shenk, Rowell, Lamberson & Thomas and Breckinridge Thomas for Defendants and Appellants.

Lerrigo, Thuesen & Thompson and Donald C. Thuesen for Plaintiffs and Respondents.

BROWN (R. M.), J.—This appeal is taken from a judgment in favor of plaintiff Balfour, Guthrie & Co., Ltd., against Clifford L. Hansen and Howard W. Hansen individually and as partners in the partnership of L. H. Hansen & Sons, L. H. Hansen & Sons, and Pacific Indemnity Company, based on findings of fact and conclusions of law that the general contractor, L. H. Hansen & Sons, was guilty of actionable fraud during the construction in 1949-50 of 10 silos in the City of Fresno.

Southwest Storage Company owned certain real estate upon which it hired defendant L. H. Hansen & Sons to build 10 silos based on certain plans and specifications which followed the plans which had been previously drawn by a San Francisco firm for eight existing silos which were adjacent to this property, with certain modifications. The plans, as modi-

fied, were checked by R. B. Welty, a civil engineer. L. H. Hansen & Sons had submitted an offer for $136,910 which was accepted. Hansen then secured a performance bond from Pacific Indemnity Company, another defendant herein, covering the amount of the bid, and Southwest Storage Co. was named as the obligee.

In 1955 Southwest sold the 10 silos to J. B. Hill Co. and later Southwest Storage Co. ceased to exist. In late 1957 Balfour bought all the silos and discovered there were cracks in them; in 1958 Balfour wrote a letter of demand to the defendants and Southwest, but in April 1959 settled any claims it had against Southwest and others and procured an assignment of various claims from the various people, including Southwest. In July 1959 Balfour, with Southwest as a coplaintiff and also Southlake Farms, Inc., a corporation, and Westlake Farms, Inc., a corporation, but not J. B. Hill Co., sued the defendants.

Southwest Storage Co. was a partnership formed in the year 1949, composed of Westlake Farms, Inc., a partnership, and Southlake Farms, Inc., a corporation. In November 1949 this partnership, Southwest Storage Co., purchased certain real property in Fresno which was adjacent to eight existing grain storage silos owned by J. B. Hill Co., a corporation. The property was purchased from J. B. Hill Co. Southwest desired to build 10 new grain storage silos upon the property and purchased and took the plans which had been previously drawn by a San Francisco firm for the existing eight silos and secured a draftsman to copy the same with certain modifications. The plans and specifications which were urged by plaintiffs as those applicable to this new construction were general specifications for conventional silo-type construction. These plans and specifications disclosed that the same had been "checked" by R. B. Welty, civil engineer, and his approval placed in writing upon them. Southwest twice called for bids for the desired construction, one dated October 28, 1949, and the other, October 29, 1949, the latter specifically referring to "plans and specifications completed November 7, 1949, and checked by R. B. Welty, C.E." This call for bids also specified that "Construction will be completed within 85 days after work is started."

L. H. Hansen & Sons submitted an offer in writing in the sum of $136,910 to construct 10 silos per plans and specifications "prepared by R. B. Welty, Civil Engineer." The Hansen bid was accepted in writing by Southwest on November 21, 1949.

The trial of this action took place 12 years after the bid and the memories and records relative to the identity of the exact plans and specifications that the defendant contractor received and used are not supported by any clear or definite evidence and were scanty to say the least. It was the trial court's determination that the plans and specifications submitted as Plaintiffs' Exhibit No. 1 were the plans and specifications pursuant to which the 10 grain silos were to be constructed.

Following the acceptance of the bid by L. H. Hansen & Sons, this defendant secured a contract performance bond from Pacific Indemnity Company covering the amount of its bid, with L. H. Hansen & Sons named as principal, Pacific Indemnity Company as surety, and Southwest Storage Co. as obligee. It is interesting to note that both the contract and the bond refer to plans and specifications "prepared by" R. B. Welty, civil engineer. The contract bond contained the following language: "No right of action shall accrue under this bond to or for the use of any person other than the said Obligee."

The construction of the 10 silos was performed by using the slip-form method of construction. This was the first such job undertaken by the general contractor, but Mr. Roy Kashner, who was employed by the general contractor, was experienced in this type of construction and he supervised the entire construction of the 10 grain silos, which were completed in May 1950. In utilizing the slip-form type of construction, which consists of continuous pouring of concrete, it should be here noted that the vertical steel reinforcing rods are initially spaced in accordance with the plans and specifications and are held in place by a yoke that is located approximately 6½ feet above the forms and the horizontal steel. By using this method, the horizontal and vertical steel is at all times visible to the naked eye. With respect to the vertical steel, 5 to 8 feet of the same are always visible above the forms and the concrete that has been poured, and two rows of horizontal bars are always visible under the yoke prior to the pouring of any additional concrete. Forms are filled with concrete and jack rods are also utilized for the purpose of lifting the slip forms as the pouring of concrete progresses. These jack rods were placed on 8-foot centers around each silo and were left in the construction, in addition to the reinforcing steel, pursuant to the approval of Mr. Welty. The entire slip form covering all 10 silos is raised approximately one foot in two

hours as concrete is poured, making a nonstop operation. The first 40 feet were poured and then the pouring was stopped for other work on the bottoms, and the same process continued until a height of 105 feet was reached.

In the performance of this construction, the general contractor employed a Mr. L. A. Jones, a steel subcontractor, who submitted a bid on the basis of published prices prevalent at the time in the sum of approximately $25,000. His bid was based on the quantity of steel which he determined would be necessary to meet the specifications and the cost of installing the same. In the deposition of L. A. Jones which was admitted into evidence, he testified that once the ring horizontal steel bars are formed the only place they could be used would be on that particular job as it would be more costly to attempt to straighten them for a different use than to buy new steel. James Anderson, sales manager for Pittsburgh Des Moines Steel Company, testified that using the 1949 prices and placing a bid upon the plans and specifications in question, his company would have submitted a bid of about $26,000, which was within approximately $1,000 of the bid by L. A. Jones.

The silos were completed in May 1950. A few weeks later some hairline cracks appeared and Clifford Hansen requested Mr. Welty to return and examine them. Mr. Welty did so and recommended a method of repair which the defendant contracting firm thereafter accomplished. The silos were then used by Southwest without interruption or restriction until May 1955, when Southwest sold the silos to J. B. Hill Co.

At about this time the partnership of Southwest Storage Co. ceased to exist; all shares of stock and assets of Southlake Farms, Inc., a corporation, one of the partners, were sold, and Westlake Farms, Inc., a partnership, the other partner in Southwest, was dissolved. A corporation was formed in the name of Westlake Farms, Inc., but there is no evidence as to whether it actually succeeded to the assets or liabilities of the former partnership. At the time of the trial Southwest Storage Co. had no assets. Apparently there was no formal dissolution of that partnership, but neither was there any evidence of any written partnership agreement.

In 1955 Balfour became interested in purchasing the properties from J. B. Hill Co., and engaged Jack Hunter who was a partner in a business selling mill equipment and engineering installations to appraise the silos in question. At that time he noticed some hairline cracks in the silos but testified that he was not alarmed because that is not uncommon. In

October 1955 Balfour bought the silos from J. B. Hill Co. as part of a larger transaction, and thereafter J. B. Hill Co. changed its name to Grover B. Hill Company.

Late in 1957, Hunter testified, an employee of Balfour observed some pieces of concrete breaking loose from the inside of the silos. Upon investigation to find the cause of this breaking, Wayne Taul, a structural engineer, was engaged to examine the silos. After cutting approximately 15 probe holes in the silos, Mr. Taul came to the conclusion that 40 per cent or 50 per cent of the structural reinforcing steel called for in the specifications was missing. The probe holes were from 3 to 4 feet in height and approximately 3 feet wide, at levels of 25 feet, 50 feet, and 75 feet above the ground. One probe hole was cut in silo No. 9; none was cut in silo No. 10; two in silos Nos. 11, 12, 17 and 18; and three in silos Nos. 13, 14, 15 and 16. From his findings in these several probe holes and from what Mr. Taul could see "as a pattern" on portions of the walls on the inside of the silos, the extent of which was not brought out, he reached his conclusion as above set forth. In February 1958 Balfour wrote a letter of demand to the defendants.

In April 1959 Balfour elected to settle any claims that it might have against all except defendants herein and executed and delivered a release of all claims to Southwest Storage Co., Southlake Farms, Inc., a dissolved corporation, Westlake Farms, Inc., a corporation, and Grover B. Hill Company (formerly J. B. Hill Co.). At the same time Balfour secured an assignment of various claims therein named from the organizations which were signatories thereon. As consideration for said release, Roland F. Hill, through Westlake Farms, Inc., and his former association with Southlake Farms, individually paid to Balfour the sum of $5,000. Other individuals or firms, not named, paid to Balfour an additional $10,000. Neither Grover B. Hill Company nor Southwest Storage Co. paid any money to Balfour.

Efforts were made during the course of the trial to minimize his duties and capacity as a representative of the owner; however, the record discloses that R. B. Welty, a civil engineer, was originally hired to "check" the plans and specifications, but that before construction commenced, and during construction, his duties were extended materially.

The record discloses that in December 1949 Mr. Welty issued what appears to be a change order in writing to L. H. Hansen & Sons in which he made a change in the specifica-

tions substituting splices for hooks in the vertical reinforcing bars, added a new drawing to the plans and specifications, eliminated all reference to steel decking, substituted certain steel beams and relocated their placement, provided for certain variations in the method of connecting the bins under construction to the existing bins, and directed a cessation of the concrete pour at a height of 40 feet to facilitate placement of the concrete slabs in the bottoms of the bins. In addition to writing change orders, there were verbal change orders either instituted or approved by Mr. Welty, as for example, Clifford Hansen's request for permission to leave the jack rods in the wall rather than replacing them with the reinforcing steel rods in each case, and the placing of the horizontal steel on either the inside or outside of the vertical steel. Mr. Welty, himself, verified that on occasions when the defendants desired permission to make changes from the plans and specifications, they looked to him as the engineer for the owner for permission to do so and made the request verbally.

In furtherance of Mr. Welty's association with and knowledge of the construction of the silos in question, and with reference to his approval of progress payments submitted by the defendants, in at least one instance he corrected an error which he found in one of the requests, and in approving the fourth progress payment Mr. Welty indicated his close connection with the job by adding a paragraph in which he stated that he would work up a change order in the very near future covering items of omission such as steel decking, keyed joint with the old tanks which were mentioned in an earlier change order, stopping the pour of the main walls at an elevation of 40 feet, the addition of the steel frame covering the southern entrance to the tunnel, and the rerouting of the sewer line. In his letter of transmittal of the request for final payment Mr. Welty explained in some detail the extra charges and the credits which were involved. He visited the job at least twice daily, where he was able to clearly see the reinforcing steel, both horizontal and vertical, and its location and spacing.

In addition to the foregoing, Mr. Welty was employed by Southwest to review and check all pay estimates submitted by the general contractor for periodic progress payments during the course of construction and state his recommendation concerning payment. That he did. With respect to each pay estimate so submitted by the general contractor, his letter of transmittal to Southwest contained the following lan-

guage: "This estimate has been checked by me and embodies all materials delivered to the site and incorporated into the job and it is recommended that this amount be paid."

The evidence discloses that this certificate, executed by R. B. Welty, was required by the obligee in order for it to secure progress payments from the Commodity Credit Corporation, a federal agency, from whom the obligee had secured financing for the construction in question.

The complaint of Balfour, including Southwest Storage Co., Southlake Farms, Inc., and Westlake Farms, Inc., as plaintiffs, alleges the following:

The first cause of action alleges a contract and charges all defendants except Pacific Indemnity Company with having "deliberately and with intent to cheat and defraud plaintiffs" breached that contract in the following particulars: Certain ring bars of reinforcing steel were located on 10-inch to 13-inch centers instead of 6-inch centers as specified, ring bars that should have been on 7-inch centers were actually located on centers of 14 inches or more, and those which should have been on 8-inch or 10-inch centers were actually located on centers of 14 inches or more; the vertical bars of reinforcing steel which should have been located on 12-inch centers were actually located on centers of 24 inches or more; the vertical bars were located outside rather than inside the ring bars and they were not tied to the ring bars; the reinforcing steel was located near the inside surface of the concrete walls rather than at the center of those walls; the reinforcing steel for the concrete hopper bottoms was not imbedded in the concrete but was simply dropped on the sand beneath the concrete; the cement used was of inferior quality and used in quantities below those specified; the water used to mix the cement was not fresh water; the cement was not properly vibrated and was not poured continuously; the average impressive strength of the concrete walls was less than 2,000 p.s.i. rather than a minimum of 2,500 p.s.i.

The first cause of action also alleges deliberate misrepresentation by said defendants and that the breaching of the contract was thus done "deliberately, wilfully, and with the purpose of cheating and defrauding plaintiffs" and further, that defendants "deliberately, wilfully, fraudulently and falsely represented to plaintiffs that the elevators had been constructed in accordance with the terms of the construction contract," and that the plaintiffs "had no way of

knowing and could not determine the true condition of the elevators until the elevators began to crack and deteriorate.''

It is admitted that plaintiff Balfour is suing only as an assignee.

The second cause of action is a repetition of the first, but against Pacific Indemnity Company.

The third cause of action also repeats the first cause, and adds allegations that defendants ''deliberately and wilfully failed and refused to construct the grain elevators in accordance with the terms of the construction contract''; ''deliberately and wilfully charged plaintiffs and received from plaintiffs payment for materials which were not used in the construction of the elevators''; ''deliberately and wilfully'' represented that the silos were properly constructed, knowing the representations to be false but intending that plaintiffs rely on them.

A prayer for damages follows. The prayer for exemplary damages was not allowed by the trial court.

Hansen & Sons answered, admitted the building of the silos, the amount, and that there was some cracking of the silos, but otherwise denied any remaining allegations, particularly fraud, concealment, etc.; denied lack of opportunity or inability of Southwest or anyone else to determine the exact materials and construction used therein, alleged that Welty was the owner's engineer, was present and had personal knowledge of the construction and every opportunity to observe the construction; alleged a subcontract for the furnishing and placing of the reinforcing steel, payment thereof by defendants to said subcontractor, afforded full knowledge and opportunity for knowledge of the work and materials and approval of all of the work by Welty as engineer and agent for the owner, Southwest; denied that defendants failed to construct the silos in accordance with plans and specifications. They pleaded separate defenses of the bar of several statutes of limitation in that the complaint was filed in July 1959 and the silos were constructed in 1949 and 1950; that plaintiffs are guilty of laches; denied that plaintiffs have been damaged by reason of anything defendants did or did not do; and denied any cause of action in the various plaintiffs raising the following issues: (1) was there a valid assignment of the cause of action by the coplaintiffs to plaintiff Balfour? (2) has the plaintiff Balfour the right to sue herein? (3) does Southwest have the right to sue herein? (4) what is the status of the Southwest Storage Company?

Defendants also denied the liability of Pacific Indemnity Company to plaintiff Balfour, or that there was any cause of action against Pacific Indemnity Company stated by reason of the restrictive terms of the bond which limits the obligation of Pacific Indemnity Company to the obligee, Southwest Storage Co.

The trial court found that: Hansen & Sons did breach the contract and were guilty of actionable fraud in failing to construct the elevators in accordance with the plans and specifications in the following particulars: Numerous ring bars and vertical bars of reinforcing steel were not located on the specified centers; vertical bars were located outside rather than inside the ring bars as required; the reinforcing steel was located near the inside surface rather than the center of the walls; the reinforcing steel for the concrete hopper bottoms was not imbedded in the concrete but laid partially in the sand beneath the concrete (in a later finding the court determined that this was negligence only); the cement used did not meet the required minimum of 2,500 p.s.i.; defendant L. H. Hansen & Sons knew the elevators were not constructed in accordance with the plans and specifications; the breach was deliberate and done with intent to defraud Southwest; none of the plaintiffs, their agents or employees had any knowledge or should reasonably have acquired any knowledge prior to February 15, 1958, that the elevators were not constructed in accordance with the plans and specifications; Welty was not hired to and did not supervise the construction of the elevators; Welty had no knowledge of the breach of the contract by Hansen & Sons or that they had materially deviated from the plans and specifications, nor should he have reasonably acquired such knowledge or discovered the breach or the failure to follow the plans; Welty did not have equal opportunity with Hansen & Sons to observe the placing of said reinforcing steel and the quantity thereof and was not hired to perform on-the-job supervision; Hansen & Sons represented to plaintiff Southwest that the 10 elevators were built in accordance with the plans and specifications, and in reliance thereon Southwest paid all sums due defendants under the terms of the contract; Hansen & Sons made statements that the construction was in accordance with the plans and specifications without reasonable grounds for believing them to be true; none of the plaintiffs could have reasonably discovered the breach or the defective construction prior to February 15, 1958, and the fact of said defective construction

did not become apparent until 1958; the action which was commenced on July 29, 1959, was commenced within a reasonable time after the facts of the breach were discovered or could reasonably have been discovered; plaintiffs have not been guilty of laches or unreasonable delay in bringing the action and defendants have not been prejudiced by any delay; defendant Hansen & Sons represented to Southwest that the elevators had been built in accordance with the plans and specifications with the intent that Southwest should rely on said representations, and Southwest did rely on said representations; the course of conduct of Hansen & Sons, their agents and representatives, was fraudulent, malicious and oppressive.

The court concluded, among other things, that L. H. Hansen & Sons was responsible for the acts and omissions of its agents, employees and subcontractors; that respondent Pacific Indemnity Company became liable to Southwest on a faithful performance bond; that L. H. Hansen & Sons, with intent to cheat and defraud Southwest, breached said contract by failing to construct the elevators in accordance with the plans and specifications; that such false representations were made with the intent that Southwest rely on such representations, and Southwest was defrauded and damaged by such reliance; that the approval by Robert B. Welty of the estimates for progress payments did not constitute acceptance or approval of work done by L. H. Hansen & Sons which was not in conformity with the plans and specifications; that payment by Southwest to L. H. Hansen & Sons did not constitute an acknowledgment that the elevators had been constructed in accordance with the plans and specifications and did not constitute a waiver of the breach of contract; that a valid assignment was made by Southwest Storage Co. to Balfour, Guthrie & Co., Ltd.; that neither Southwest nor Balfour was guilty of laches; and that the action was not barred by the one-year statute of limitations, by the two-year statute of limitations, by the three-year statute of limitations, or by any statute of limitations. The court allowed damages in the sum of $108,465.32.

The appellants specify that there are errors of law and that there is not sufficient evidence to support the judgment or the findings and conclusions of the court that: (1) At the time of the transfer between Southwest Storage Co. and J. B. Hill Co. and the subsequent transfer from Grover B. Hill Company (formerly J. B. Hill Co.) to Balfour, Guthrie &

Co., Ltd., none of the parties were, nor should they have reasonably been, aware of the defects in the elevators; that both J. B. Hill Co. and Balfour, Guthrie & Co., Ltd., purchased said elevators upon the understanding and belief that they were sound and had been built in accordance with the plans and specifications of the contract between Southwest Storage Co. and L. H. Hansen & Sons; (2) the rights and causes of action accruing to Southwest Storage Co. by virtue of the breach of contract, and under the faithful performance bond issued by Pacific Indemnity Company were assigned to Balfour, Guthrie & Co., Ltd., in April 1959; (3) Southwest Storage Co. existed as a partnership on April 30, 1959, for the purpose of assigning all rights and causes of action against defendants to Balfour, Guthrie & Co., Ltd., including the bond; (4) plaintiff Southwest Storage Co. made a valid assignment of this cause of action; and (5) defendants are not entitled to a reduction in the amount of damages.

Appellants contend that each of the findings and conclusions that L. H. Hansen & Sons are guilty of fraud sufficient to toll the statute of limitations in that there was misrepresentation to Southwest that the elevators had been built in accordance with the plans and specifications, is not supported by the evidence and is contrary to law; that the determination by the trial court that the cause of action for fraud by a partnership long since dissolved and suffering no damage is assignable was an error of law; that the findings, conclusions and judgment determining that irrespective of the full release of all claims by Balfour to Southwest, the plaintiff Balfour, as an assignee, may nevertheless sue defendants for greater damages than those suffered by the assignor, was error; that the findings regarding Southwest's having no knowledge of any deviation from the plans and specifications and the finding that defendant was guilty of fraud sufficient to toll the statute of limitations is contrary to law; that the findings and conclusions that neither Southwest nor Balfour was guilty of laches and that the causes of action were not barred by the statute of limitation are not supported by competent evidence and are contrary to law; that the finding and conclusion that the purported assignment of the cause of action against Pacific Indemnity Company, particularly in the light of the restrictive language against assignment contained therein, is valid, permissible and not violative of the rights and obligations of the surety, are contrary to law; and

that the trial court erred in rendering judgment in favor of plaintiff and against defendants.

### ASSIGNABILITY OF CAUSE OF ACTION

The trial court found that the rights and causes of action accruing to Southwest were assigned to the plaintiff for a valuable consideration.

California Civil Code section 1458 provides: "A right arising out of an obligation is the property of the person to whom it is due, and may be transferred as such."

In 1959 the Southwest Storage Co. was composed of a corporation and a partnership, either of which could convey and assign choses in action. Where a corporation is dissolved, section 5400 of the Corporations Code states: "A corporation which is dissolved by the expiration of its term of existence, by forfeiture of existence by order of court, or otherwise, nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it, and enabling it to collect and discharge obligations, dispose of and convey its property, and collect and divide its assets, but not for the purpose of continuing business except so far as necessary for the winding up thereof."

In *Wiseman* v. *Sierra Highland Min. Co.*, 17 Cal.2d 690, at page 697 [111 P.2d 646], it is said: "The power of the directors as trustees of the assets of the California corporation includes the power to sell the corporate property whenever in their judgment it becomes necessary for the settlement of the corporate affairs." As far as the partnership is concerned, section 15029 of the Corporations Code provides: "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." And section 15030 of the Corporations Code provides: "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."

The choses in action were assets of Southwest, though their existence was not discovered until later. The partners may dispose of such assets and may choose to assign such choses in action to the plaintiff by the laws of the State of California, and the trial court so found on the evidence presented that Southwest had effectively assigned such choses in action to the respondent Balfour. Thus, the respondent Balfour "stands in the shoes of his assignor." (5 Cal.Jur.2d, Assignments, § 56, pp. 337-338; also, § 21, p. 294.)

Southwest, upon a breach of contract, could have sued for all future detriment reasonably certain to occur as set forth in Civil Code section 3283, as follows: "Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future."

The plaintiffs can recover no more damages than Southwest might have sought. The assignee can recover no more than could the assignor.

It is fallacious to contend that Southwest suffered no damages by the actions of appellants. All parties to the subsequent sale to Southwest believed that the elevators were sound but this was the mutual mistake of a material fact. To avoid circuity, it was unnecessary for respondent Balfour to rescind its purchase of the elevators from J. B. Hill Co. who would also then have to do the same thing as far as Southwest is concerned.

The bond, which stated, "No right of action shall accrue under this bond to or for the use of any person other than the said obligee," if a cause of action existed, gave such a cause of action to Southwest to sue for the faithful performance under the bond. The distinction which was considered by the trial court was the difference between a contract (the bond) and rights coming into existence after a breach of that contract.

In *Trubowitch* v. *Riverbank Canning Co.*, 30 Cal.2d 335 [182 P.2d 182], the contract was not assignable without the consent of the seller, a breach occurred, and the plaintiff sued as an assignee of the injured party. There, the court stated at pages 339-340: "It is established that a provision in a contract or a rule of law against assignment does not preclude the assignment of money due or to become due under the contract [citations], or of money damages for the breach of the contract."

The prohibition against assignment does not prevent assignment of a cause of action under the contract. (See *Ginsburg* v. *Bull Dog Auto Fire Ins. Assn.*, 328 Ill. 571 [160 N.E. 145, 56 A.L.R. 1387].)

Volume 2, Williston on Contracts (revised edition) Assignment of Contracts, section 422, at page 1215, states: "But if such an interpretation of a policy is possible, an assignment of a right which has already accrued under the policy is held not to be within prohibition against assignment; and even though the policy clearly forbids assignment

after as well as before loss, it has been held that the provision is void.'' (See also 5 Cal.Jur.2d, Assignments, § 21, p. 294.)

Thus, it is clear that the liability of Pacific Indemnity Company has not been extended, modified, or in any manner enlarged by the assignment to the plaintiff. The bond by its own terms incorporates the plans and makes Pacific Indemnity Company a party to the contract. (See *Callan* v. *Empire State Surety Co.*, 20 Cal.App. 483 [129 P. 978, 981]; and *W. P. Fuller & Co.* v. *Alturas School Dist.*, 28 Cal.App. 609 [153 P. 743].)

Thus, it is immaterial whether or not the Pacific Indemnity Company is treated as a surety or as a principal, inasmuch as the trial court found the language of the bond did not restrain or prevent the assignment of the cause of action arising under the bond.

*Mason* v. *Drug, Inc.*, 31 Cal.App.2d 697 [88 P.2d 929], is authority that a naked right of action for fraud is not assignable but does state that it is, when assigned in connection with the property that was obtained by fraud and deceit.

In *Wikstrom* v. *Yolo Fliers Club,* 206 Cal. 461, the court said at page 464 [274 P. 959], in part quoting from *Rued* v. *Cooper,* 109 Cal. 682, 693 [34 P. 98]: '' 'Assignability of things in action is now the rule; nonassignability, the exception; and this exception is confined to wrongs done to the person, the reputation, or the feelings of the injured party, and to contracts of a purely personal nature, like promises of marriage.' We have no doubt that under the above general doctrine alone, the cause of action in question must be held assignable and to have survived.''

### BREACH OF CONTRACT

The contract between Southwest and L. H. Hansen & Sons incorporated certain plans and specifications for the construction of the silos. According to the findings, there were many deviations, among which were the following: that the ring bars were not located as provided for in the specifications; that the vertical bars were not located on 12-inch centers; that the vertical reinforcing steel was located near the inside of the walls rather than at the center as required by the specifications; and that the concrete was not handled in such a way so as to comply with the specifications as to the required minimum strength of 2,500 per square inch. These findings stated that there was a breach of the contract and the cause of action existed in Southwest. Under ordinary circumstances the statute of limitations would commence running

upon the breach; however, the court found that the causes of action were not barred by any statute of limitations. (See Code Civ. Proc., § 338, subd. 4.)

A careful review of the evidence of the fraudulent concealment of the cause of action indicates that Howard Hansen and Clifford Hansen and the superintendent, Roy Kashner, who was the main foreman on the job spending some 14 to 16 hours per day on the job, represented to the owners that the elevators were constructed in accordance with the plans and specifications, that Roland Hill and Joseph Weirick, who were partners in Southwest Storage Co., were on the job daily but had no knowledge of the defects, and the nature of their duties was not such as to give them any basis upon which they could determine that faulty construction was being followed or had been followed. John Hunter, on inspecting the grain elevators for Balfour, was unaware of any defects in the construction.

The very breach of contract itself was concealed by concrete which was being poured under the slip-form process of continuous 24-hour-per-day construction, and it moved to a height of 105 feet in a short period of time.

The court found as far as Robert Welty, the licensed civil engineer, is concerned, that he had no knowledge of the breach, should not have reasonably acquired any such knowledge or discovered such breach, that he did not have equal opportunity with L. H. Hansen & Sons to observe the placing of the steel nor was he employed to perform on-the-job supervision.

█ Fraudulent concealment of the facts is a good answer to the defense of the statute of limitations. In *Sears, Roebuck & Co.* v. *Blade*, 139 Cal.App.2d 580, it was said at page 590 [294 P.2d 140], quoting from *Tognazzini* v. *Tognazzini*, 125 Cal.App.2d 679, at page 687 [271 P.2d 77]: " 'When the facts are susceptible to opposing inferences, whether a party had notice of circumstances sufficient to put a prudent man on inquiry as to a particular fact, and whether by prosecuting such inquiry he might have learned such fact, are questions of fact to be determined by the trial court.' "

In *Grace* v. *Parker* (Tex.Civ.App.), 337 S.W.2d 518, where the owner sued the building contractor, defense of the statute of limitations was raised, and the court found that a breach of contract (a defect in the foundation resulting from a failure to follow the plans and specifications, which defect was concealed) tolled the statute of limitations, further stating at

page 521, that when there is a concealment of a material fact of the transaction, knowing the other party acts upon the assumption that no such fact exists, " ' "the concealment is as much a fraud as if the existence of the fact was expressly denied or the reverse of it expressly stated." [Citation.] ' "

The appellant has maintained that the means of knowledge is to be equated with discovery. In *Vai* v. *Bank of America,* 56 Cal.2d 329, 343 [15 Cal.Rptr. 71, 364 P.2d 247], the court said: "... 'discovery is different from knowledge, [so] that where a party defrauded has received information of facts which should put him upon inquiry, and the inquiry if made would disclose the fraud, he will be charged with a discovery as of the time the inquiry would have given him knowledge.' (*Victor Oil Co.* v. *Drum,* 184 Cal. 226, 240 [193 P. 243].) 'The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.' (*Tarke* v. *Bingham,* 123 Cal. 163, 166 [55 P. 759].) 'Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances "a prudent man" would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery.' (*MacDonald* v. *Reich & Lievre, Inc.,* 100 Cal.App. 736, 740-741 [281 P. 106].) "

In *Edgar Rice Burroughs, Inc.* v. *Commodore Productions & Artists, Inc.,* 167 Cal.App.2d 463, where the court discusses knowledge, it states at page 477 [334 P.2d 922] : "In many cases it has been said that means of knowledge are equivalent to knowledge. [Citing cases.] This is true, however, only where there is a duty to inquire, as where plaintiff is aware of facts which would make a reasonably prudent person suspicious."

In the present case, the trial court found that there were no circumstances to cause the owners or their agents to become suspicious.

While there is no question that the steel was not placed in the silos by the testimony of the various witnesses who cut sections out of the silos and determined the facts as to the location of the vertical as well as the horizontal bars, Mr. Kashner, who spent from 14 to 16 hours per day on this slip-form process construction job, did not know of any deviations from the proper placement of the steel. Clifford Hansen and Howard Hansen likewise knew of no such deviations. Thus, the question was raised as to whether Mr. Welty, who was on the deck once or twice and visited the construction

project each day for a few minutes, and Mr. Hill and Mr. Weirick, who had no experience in building, should have become suspicious as to the placement of the steel or the location of the ring bars or the improper placing of the concrete.

In *Teitelbaum* v. *Borders*, 206 Cal.App.2d 634, with regard to knowledge being equivalent to discovery, the court said at page 640 [23 Cal.Rptr. 868] : ''The plaintiff in the present action not only had the means of discovery, but had actual knowledge of the alleged fraud and the alleged conspiracy against him.''

In *Turman* v. *Holmes*, 29 Cal.App.2d 198 [84 P.2d 225], the plaintiff had been defrauded by the same defendant on two previous occasions, which should have caused him to make inquiry or to investigate, and the court held that this would be equivalent to knowledge.

The respondents also note that an additional basis for the tolling of the statute of limitations is found in the representations by the appellant L. H. Hansen & Sons to Southwest that repairs had been accomplished as far as some cracks which had shown up within three weeks after the construction had been completed were concerned. This position is supported in the case of *Aced* v. *Hobbs-Sesack Plumbing Co.*, 55 Cal.2d 573 [12 Cal.Rptr. 257, 360 P.2d 897], where it involved a radiant heating system's being installed by the defendant subcontractor who repaired certain leaks in the tubing which was laid in the cement. There, the court stated at page 585: ''The statute of limitations is tolled where one who has breached a warranty claims that the defect can be repaired and attempts to make repairs.'' There was apparently no way of knowing whether the corrosion was occurring, since the tubing was imbedded in the concrete floor of the building.

Fraud, deceit and misrepresentation are covered in Civil Code sections 1571, 1572, 1573, 1709 and 1710.

█ The elements and the facts supporting the existence of fraud in this matter, in general, are: that the appellant Howard Hansen testified that progress payment requests were his representation that the various portions of the structure had been completed in installments in accordance with the plans and specifications, that when the repairs were made the elevators were sound and no additional repairs would be required, and that the representations of Kashner, as agent, were in these instances the representations of L. H. Hansen & Sons. The testimony of Wayne Taul, structural engineer,

clearly established that the structure was not completed in accordance with the plans and specifications.

In *Dyke* v. *Zaiser*, 80 Cal.App.2d 639, at page 654 [182 P.2d 344], the court said: "Direct proof of fraudulent intent is often an impossibility, and proof indicative of fraud may be given by inference, by circumstances surrounding the transaction, and the relationship and interest of the parties."

The testimony of Roy Kashner about its being an impossibility to leave out the steel is very hard to explain. ■ "An agent acting within the scope of his employment renders his principal liable for his frauds and misrepresentations, for the principal cannot be permitted to derive any advantage from the fraud of his agent by claiming that such conduct was not authorized by him." (2 Cal.Jur.2d, Agency, § 152, p. 846; see also *Filippi* v. *McMartin,* 188 Cal.App.2d 135 [10 Cal.Rptr. 180]; *Buist* v. *C. Dudley DeVelbiss Corp.,* 182 Cal.App.2d 325 [6 Cal.Rptr. 259]; and Rest. 2d Agency, §§ 261, 262, pp. 570-573.)

Respondents claim that if it is true that the Hansens had no personal knowledge of the extent to which plans and specifications were followed, the representations that the structures had been completed in accordance with the plans and specifications would have been carelessly made without reasonable basis for their belief, and that this is actionable fraud as defined in Civil Code section 1572. ■ Howard Hansen's testimony indicates that he had no personal knowledge of the amount of steel or the placement of steel, but no actual intent on the part of the defendant need be shown to create an action for fraud, as stated in *Clar* v. *Board of Trade*, 164 Cal.App.2d 636, at pages 644-645 [331 P.2d 89]: "Fraud in this state includes not only intentional misrepresentation, but may also consist of a negligent misrepresentation. Section 1572 of the Civil Code includes in its definitions of 'actual fraud' the 'positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true.' Section 1710, subdivision 2, of the same code defines 'deceit' as 'The assertion, as a fact, of that which is not true, by one who has no reasonable grounds for believing it to be true.'
. . .

■ ". . . The plaintiff must plead and prove that defendant made a representation of a material fact; that such fact was false; that defendant knew it to be false or negligently or recklessly made the assertion as a fact without reasonable

grounds to believe it to be true; that such representation was made with intent to induce the other party to act upon it; that it was relied upon by the other party to his damage."

■ These representations were made with intent to induce action by the plaintiff, and while a person may not be under a duty to speak, he does have a moral as well as legal duty to speak the truth if he does so. (*Rogers* v. *Warden*, 20 Cal.2d 286, 289 [125 P. 7].)

■ These representations were relied on inasmuch as payment was made to L. H. Hansen & Sons by Southwest who believed that the elevators were finished in accordance with the plans and specifications and there was reasonable reliance inasmuch as Southwest had no one competent to determine the quality of construction. The relationship as far as Welty is concerned will subsequently be considered.

In *Bagdasarian* v. *Gragnon*, 31 Cal.2d 744, at page 748 [192 P.2d 935], the court stated: "An independent investigation or an examination of property does not preclude reliance on representations where the falsity of the statement is not apparent from an inspection, or the person making the representations has a superior knowledge, or the party relying thereon is not competent to judge the facts without expert assistance."

We find in *Roseman* v. *Canovan*, 43 Cal. 110, that the buyer of the wool from a ship had the opportunity of making an investigation as to whether the wool was dry or not, but taking the word of the seller that the wool was dry he was not required to make a further personal investigation of the wool, which turned out to be wet; he could rely on such representations without a further examination of the bales of wool. (See also *Clar* v. *Board of Trade, supra,* 164 Cal.App. 2d 636.)

In *Wennerholm* v. *Stanford University School of Medicine,* 20 Cal.2d 713 [128 P.2d 522, 141 A.L.R. 1358], the defendant based his defense partly on the fact that the plaintiff had relied upon the advice of his doctor, but the court held that the defendant is not relieved from his own misrepresentation by the fact that the plaintiff has acted in reliance upon statements of others as well. In the present case, the damages which the court awarded were the results of the reliance by Southwest on the representations of L. H. Hansen & Sons.

In *Owen* v. *McDonald*, 96 Cal.App.2d 65, 68-69 [214 P.2d 430], the court stated that a finding of fraud must be based upon clear and convincing evidence, and that "Whether

fraudulent representations were made was a question of fact for the court. [Citation.] Under the circumstances, the finding that there were no fraudulent representations made is conclusive on appeal.''

The appellants' brief constantly refers to the fact that Mr. Welty was the agent for Southwest and that he should have been successful in finding that the appellants were attempting to defraud Southwest. Mr. Welty, as proven by the evidence, had signed the statement upon the specifications, ''Plans checked by R. B. Welty, C. E., Fresno, California.'' Mr. Welty had made arrangements with the Pacific Coast Aggregates Company as to the composition of the concrete, setting forth the formula. The Pacific Coast Aggregates Company stated that on the basis of the formula submitted, the formula would yield an impressive strength of 2,500 p.s.i. in 28 days ''if the amount of water is not exceeded.'' At no place during the trial is there any showing that any excess water was added. Test samples were made of the concrete from the trucks as it was delivered and these tests did indicate that the p.s.i. was in the amount specified, but this does not necessarily mean that the concrete was properly poured as the building was being constructed. Mr. Welty testified that he spent approximately two hours a day at the site during the early period of construction and later on visited the site about twice a day for about 10 minutes each morning and afternoon for which services he was paid $490. He also went up onto the deck of the silos as they were being poured, but not very often, and with regard to his signing the certificates for the payments, which read as follows: ''This estimate has been checked by me and embodies all materials delivered to the site and incorporated into the job and it is recommended that this amount be paid,'' he stated that he merely took the document that was presented to him by the appellants, checked the figures and corrected any errors made in percentages, but made no other investigation. It is true that there was testimony that he told Mr. Kashner to put the horizontal steel inside the vertical steel, but he made no checks as to distances. He stated that he probably would have said something to the contractor or notified the owner if he thought the concrete was being handled improperly or that the steel was not being placed properly, and that this was part of his obligation. However, the findings of the court on all of this evidence were that Mr. Welty had no knowledge of any breach nor should he have reasonably acquired such knowledge, that he did not have an equal opportunity

to observe the placing of said reinforcing steel and was not employed to perform on-the-job supervision, and we think that there is substantial evidence to support these findings.

Respondents rely on section 315 of the Restatement Second of Agency, at page 56, which states: "A person who fraudulently obtains a contract through, or enters into a transaction with, an agent acting within the scope of his power to bind the principal, or who by fraud causes the agent to do what would be a violation of his duty to the principal if the agent knew the facts, is subject to liability to the principal whether the fraud is practiced upon the agent or upon the principal." And they further rely on section 277 of the Restatement, *supra,* at pages 604-605, which states: "The principal is not affected by the knowledge which an agent should have acquired in the performance of the agent's duties to the principal or to others, except where the principal or master has a duty to others that care shall be exercised in obtaining information.

" . . . . . . . . . . . . . . . .

"Comment *b.* The principal is affected by information which the agent should have acquired if the principal has a contractual or other duty to third persons with respect to a matter entrusted to the agent. In such cases the principal is subject to liability for failing to act in the light of information which he should have acquired if he himself had done the work. Thus, if the principal is employed by another to investigate a matter and employs an agent to do this, as he is privileged to do, he violates his contractual duty to the other if, because the agent fails to use care in investigation, there is a failure to report what would have been discovered by the exercise of reasonable care. . . ."

The Restatement of Torts, section 541, at page 94, states: "The recipient in a business transaction of a fraudulent misrepresentation is not justified in relying upon its truth if its falsity is obvious."

Mr. Welty was not hired for the purpose of making a constant investigation of whether or not the plans and specifications were being adequately followed. His main duty was to execute the certificates so that Southwest could be paid by the Commodity Credit Corporation which was financing the construction of these silos, and had it not been for that requirement, Southwest would probably not have retained Mr. Welty or anyone else for any purpose other than checking the plans and specifications.

In *Ashburn* v. *Miller*, 161 Cal.App.2d 71, where the plaintiff was purchasing a building lot and the discussion had reference to whether or not the lot contained filled earth, the court said at pages 80-81 [326 P.2d 229]: " 'As a general rule negligence of the plaintiff is no defense to an intentional tort. (See Prosser, Torts, 402.) The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery (Rest., Torts, § 540; see cases cited in 12 Cal.Jur. 758, 759). . . . Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man. . . .' [Citation.]

" ' "Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him. In such a case no duty rests upon him to employ such means of knowledge. . . . It is said not to be just that a man who deceives another should be permitted to say to him, 'You ought not to believe or trust me,' or 'You are yourself guilty of negligence.' " ' . . .'

" . . . ' . . . It is well settled that one who has acted in a manner which would reasonably induce another to forego or discontinue an investigation of his fraudulent acts will not be heard to say that the facts would have been developed had inquiry been made.' "

It is true that in *Oppenheimer* v. *Clunie*, 142 Cal. 313 [75 P. 899], it is said that a recipient is not justified in relying on a representation the falsity of which is obvious, and which falsity he has had adequate opportunity to detect. In the present case Mr. Welty was not hired to detect any failures to comply with the plans and specifications and his short visits to the construction site were not sufficient to give him an adequate opportunity to detect unless it had been planned that he spend 24 hours a day on the job. The placing of the vertical steel was not necessarily obvious as the construction rose to a height of some 105 feet on the slip-form procedure. It was not obvious that the concrete was not being properly placed or that the ring steel was not being adequately placed and spaced. It is difficult to see how anyone could expect to observe this from the floor level when the vertical steel is protruding from heights varying from zero to 16 feet above the structure until it reached 105 feet, or that the ring steel may be seen when there are forms around the steel preparatory to pouring the concrete. Mr. Welty did not have this job, and so he was justified in relying on the representations that the estimates which he checked embodied all the materials de-

livered to the site and incorporated into the job. It is true that reliance is not justifiable if the representation is obviously false, or at least doubtful to a sufficient degree to put the recipient upon inquiry (*Filice & Perrelli Canning Co., Inc.* v. *Walton*, 95 Cal.App. 7 [271 P. 1096]), and we do not think that Mr. Welty had any reason to anticipate any suspicious circumstances which would put him on any notice such as to become a negligent omission, as set forth in *Zeller* v. *Milligan*, 71 Cal.App. 617, which states at page 623 [236 P. 349]: ''As is said in the case of *Lady Washington Consolidated Co.* v. *Wood*, 113 Cal. 482 [45 P. 809]: 'As the means of knowledge are equivalent to knowledge, if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry which, if followed, would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of these facts'. . . .''

In *Neff* v. *Engler*, 205 Cal. 484, 489 [271 P. 744], quoting from *Dow* v. *Swain*, 125 Cal. 674, 683-684 [58 P. 271], the court said: '' ' ' ''It is now settled law that one who chooses to make positive assertions without warrant will not excuse himself by saying that the other party need not have relied upon them. He must show that his representations were not in fact relied upon. . . .'' [Citations.] In Bishop on Noncontract Law, section 330, it is said: That plaintiff is too credulous is not generally a defense. ''The test of the representation is its actual effect on the particular mind, whether it is a strong and circumspect mind, or one weak and too relying.'' [Citation.] ''Every contracting party has an absolute right to rely on the express statement of an existing fact, the truth of which is known to the opposite party and unknown to him, as the basis of a mutual agreement; and he is under no obligation to investigate and verify statements to the truth of which the other party to the contract, with full means of knowledge, has deliberately pledged his faith.'' [Citation.]' ''

In Prosser on Torts (2d ed.) section 89, page 550, Dean Prosser has stated: ''In any form of relief for misrepresentation, it must appear that the injured party believed the representation to be true, and that it played a substantial part in inducing him to act or to refrain from taking action.

''In addition, such reliance must be found to be justifiable. Contributory negligence is properly a defense to an action based on a representation which is merely negligent; but

where it is intended to mislead, the recipient is not required to investigate, and his reliance is regarded as unjustified only if the truth should be apparent to his observation, or discoverable without effort.

" . . . . . . . . . . . . . . . . .

". . . If, after hearing the defendant's words, he makes an investigation of his own, and acts upon the basis of the information so obtained, he may be found not to have relied on the defendant, since the fact that he was unwilling to accept the statement without verification is evidence that he did not believe it.''

Here, Mr. Welty, acting on the belief that Southwest acted upon the representations made by L. H. Hansen & Sons, made no investigation of his own, nor was he required to do so.

It is further stated in Prosser on Torts (2d ed.) section 89, at page 551: ''He may not put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth, and still compel the defendant to be responsible for his loss.''

In *Berniker* v. *Berniker*, 30 Cal.2d 439, at page 444 [182 P.2d 55], it was said: ''As has so frequently been said, it is the general rule that on appeal an appellate court (1) will view the evidence in the light most favorable to the respondent; (2) will not weigh the evidence; (3) will indulge all intendments and reasonable inferences which favor sustaining the finding of the trier of fact; and (4) will not disturb the finding of the trier of fact if there is substantial evidence in the record in support thereof. [Citations.] It is not the province of the reviewing court to analyze conflicts in the evidence. [Citation.] Rather, when a finding of fact is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence contradicted or uncontradicted, which will uphold the disputed finding.''

The judgment is affirmed.

Stone, Acting P. J., concurred.

(Conley, P. J., deeming himself disqualified, did not participate.)

A petition for a rehearing was denied June 8, 1964, and appellants' petition for a hearing by the Supreme Court was denied July 8, 1964.